[No. D053464. Fourth Dist., Div. One. Feb. 26, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ADDISON CISSNA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*This opinion is certified for partial publication with the exception of parts II.A. and III.

COUNSEL

Charles M. Sevilla for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HALLER, J.**—The right to a trial by jury is guaranteed by the state and federal Constitutions and is a cornerstone of our legal system. We entrust to 12 jurors the solemn task of judging the credibility of witnesses, evaluating the significance of the evidence, and ultimately determining whether a defendant in a criminal trial is guilty.

To maintain the integrity of the process, potential jurors are screened for bias through the voir dire process. Those selected take an oath to follow court instructions designed to protect the deliberative process, eliminate outside influences, and generate a decision based solely on the evidence presented at trial. Jurors are told that to ensure both sides receive a fair trial, they are not to discuss the case with anyone and that deliberations must occur only in the jury room.

Here, a juror ignored these admonitions and violated his sworn duties by speaking on a daily basis about the merits of the case with his nonjuror friend. After defendant was found guilty, he learned of this juror misconduct and moved for a new trial. The prosecutor agreed the juror's conduct constituted misconduct and created a presumption of prejudice, but argued the presumption of prejudice had been rebutted. The court ruled the presumption of prejudice had been rebutted and denied the new trial motion. On appeal, defendant challenges this and several other rulings.

We conclude the trial court erred in denying the new trial motion. Because the conversations with the nonjuror were pervasive, focused on deliberative matters concerning the merits of the case, and included discussions of defendant's decision not to testify, the misconduct was prejudicial. The conversations interfered with the deliberative process and the right to have the case decided by 12 impartial jurors. When even one juror lacks impartiality, the defendant has not received a fair trial. The juror misconduct in this case requires that the judgment be reversed.

For guidance upon retrial, we reject defendant's contention that the trial court was required to give a unanimity instruction for the continuous-course-of-conduct offense defined in Penal Code[1] section 288.5. In the unpublished portion of this opinion, we address an evidentiary issue pertaining to the victim's diary.

## FACTUAL AND PROCEDURAL BACKGROUND

S., the victim in this case, is defendant's granddaughter.[2] S. lived with her parents in San Diego County, and defendant lived with his wife (S.'s grandmother) in another county. The relatives frequently visited each other at their respective homes. S., aged 16 at the time of trial, testified that defendant molested her during these visits. The molestations started in 1998 when she was seven years old. At her home, the molestations occurred primarily in her bedroom when defendant came upstairs to her room to kiss her goodnight. At

---

[1] Subsequent unspecified statutory references are to the Penal Code.

[2] To preserve privacy, we refer to various persons involved in this case by their first initials.

defendant's home, the molestations usually occurred when she was on a rollaway bed on the floor in her grandparents' downstairs bedroom. S. also recalled being molested when she was lying between her grandfather and grandmother in their bed, and on one occasion in San Diego County when she was in her bathing suit.

S. testified that during these incidents, defendant typically rubbed her vagina with his hand, and she rubbed his penis with her hand. On some occasions defendant also performed oral sex on her vagina. The molestations occurred virtually every night when defendant was visiting at her residence or she was visiting at his residence. S. recalled that on one visit to her grandparents' home when she was about nine or 10 years old, defendant came into the room when she was writing in a journal about the visit. Defendant told her "to make sure that [she] never wrote anything down or told anyone because it was [their] little secret."

S. and her mother recounted two specific incidents that occurred at S.'s house. On one occasion when S. was about eight, she asked her mother if it was "okay" if defendant did not come to her room that evening to say goodnight. S.'s mother, who knew nothing about defendant's conduct, responded that it was important for her grandfather to have his "special time" with her. Defendant then came to her room as usual and molested her. On another occasion when S. was about nine years old, her mother entered her bedroom and unknowingly interrupted the molestation. According to S., defendant was standing by her bed and she was rubbing his penis with "his boxers . . . pulled aside." S. saw "the light of the door opening," and defendant sat down on the bed "really fast." Her mother entered the room, stated it was getting late and S. had to go to bed, and then walked back out. Defendant commented "that was close," and left the room.

During this second incident, S.'s mother recalled that she had been downstairs talking with her husband and mother. Because it seemed that her father had been upstairs for an extended period of time and she wanted S. to go to sleep, she went upstairs and noticed that S.'s bedroom door was closed, which was unusual. When she opened the bedroom door, S. was lying on her bed on her back with no blankets on and defendant was seated on the side of the bed with his head "pointing down at the floor." Defendant did not look at her or initially respond; when she walked over to him and put her hand on his shoulder and stated S. needed to go to bed, he mumbled, "just a minute."

The molestations continued until S. was about 12 years old, when S. realized that her grandfather's conduct was wrong. She asked him to stop, and he complied.

About two years later, in 2005 and early 2006, S. (now aged 14) told two of her friends about the molestation. She also kept a diary during this time period, and on April 23, 2006, wrote: "There is something I really want to say. But I don't know. I've told people. But I've never put it down in writing. But I reall[]y . . . want to get it off my chest. My poppy [defendant] raped me. He started when I was about 9. I don't remember how. He never had intercourse & he never kissed me. But we did everything in between. He scarred me for life. I'm not afraid to admit it. But I'm really afraid I'll end up telling the wrong person & they will tell my mom. Because if she ever finds out, I think it would scar her too. But I think it[']s important for her to know. But not now. but when? how? Life sucks. What can you do?"

In May 2006, S.'s mother read the April 23 entry without S.'s knowledge. Shortly thereafter, she informed S.'s father about this, and the two spoke with S. S. confirmed that the molestation had happened. She told her parents that she had intended to tell them about the molestation after defendant died because she did not want to upset the family.

In addition to testimony from S. and her mother, the prosecution presented testimony from a number of other witnesses, including S.'s father, the friends in whom S. had confided about the molestation, an investigating detective, an expert witness who explained delayed disclosure and other matters, and (in rebuttal) witnesses who attested to S.'s honest character.

In defense, several family members and friends, as well as an expert witness, testified on defendant's behalf to support that he did not have the character to molest S. and there were no indications that he had molested S. or any other child. Three of defendant's other grandchildren (a teenage granddaughter, an adult granddaughter, and an adult grandson), who had all spent the night at defendant's home, testified that defendant never touched them inappropriately and they never saw anything suggesting he touched any child inappropriately.

*Jury Verdict*

Defendant was charged with eight sexual offense counts. Count 1 alleged continuous sexual abuse of a child under age 14 from August 20, 1998, to June 30, 2001. (§ 288.5, subd. (a) [three or more acts over a period of not less

than three months].) The remaining counts alleged lewd conduct and oral copulation with a person under age 14 during various time periods between July 2001 through December 2002. The first trial ended in a mistrial after the jury deadlocked on the charges. After a second trial, the jury reached a guilty verdict on count 1. The jury was deadlocked on counts 2 through 8, and the court dismissed these charges. The court sentenced defendant to the lower term of six years for the count 1 section 288.5 conviction.

## DISCUSSION

### I. *Juror Misconduct*

#### A. *Background*

After the jury rendered its guilty verdict, defendant moved for a new trial contending that the conviction must be set aside because of juror misconduct arising from Juror D.'s daily discussions about the case with his friend, G.

Defendant submitted declarations from Juror D. and from G. Juror D. and G. declared that they talked "each day at lunch about the case starting the first day of testimony." Further, every evening (or most evenings) during the trial G. called Juror D. and they talked about the case.[3]

Juror D. described the content of their discussions as follows. After three to four days of testimony he told G. that he thought defendant "was on a sinking ship." Toward the end of the prosecution's case, G. told Juror D.: " '[W]e're looking for a motive [for S. to falsely accuse defendant], and we can't find a motive yet' . . . ." The two men discussed different motives S. might have, such as the possibility that defendant was rich and was "cutting . . . off" S.'s part of the family or that another granddaughter "maybe [was] getting everything and [S.] was not." During the defense case, Juror D. commented to G. that he did not think defendant was going to testify. In response, G. told Juror D. to consider "OJ" and another high-profile defendant who did not testify and who " 'got off the hook' " even though they were guilty. Regarding S.'s testimony, Juror D. told G. that a portion of her presentation appeared "staged" and that she was looking down during her testimony.

G.'s declaration essentially corroborated Juror D.'s description of their discussions, and included some additional information. G. declared that he told Juror D. that defendant was guilty if S. did not have a motive for falsely accusing him. Further, he told Juror D. that "guilty people do not testify, and

---

[3] Trial testimony was presented over a period of about four and one-half days, and the jury deliberated for about two days.

if the defendant was not guilty he would testify." G. described several other matters that they discussed relating to witness testimony and evidentiary items. Regarding his final conclusion concerning guilt, G. declared: "Toward the end of the case, I told [Juror D.] I did not believe the evidence was sufficient to support a guilty verdict."

At the new trial motion proceedings, the prosecution conceded, and the court found, that Juror D. had engaged in misconduct by discussing the case with his friend. However, the court concluded the record showed Juror D. was not biased against defendant because of the misconduct. The court reasoned that Juror D.'s statement that defendant was on "a sinking ship" did not reflect his final conclusion that he was guilty; the consideration of whether the victim had a motive to lie was not an improper consideration; it was a normal human reaction to wrestle with the question of why defendant did not testify; ultimately the friend rendered an opinion not to convict based on the insufficiency of the evidence; and the friend's opinion did not sway Juror D. Accordingly, the court denied the new trial motion.

## B. *Legal Principles*

■ A defendant has a constitutional right to a trial by an impartial jury. (*In re Hamilton* (1999) 20 Cal.4th 273, 293 [84 Cal.Rptr.2d 403, 975 P.2d 600].) An impartial jury is one in which no member has been improperly influenced and every member is capable and willing to decide the case solely on the evidence before it. (*Id.* at p. 294.) To effectuate this right, the prospective jurors are subjected to voir dire questioning under oath to uncover any bias, and the selected jurors are sworn to decide the case based on the evidence presented to them and the instructions given by the court. (*People v. Wilson* (2008) 44 Cal.4th 758, 822 [80 Cal.Rptr.3d 211, 187 P.3d 1041]; *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803]; Code Civ. Proc., § 232.)

■ Further, to preserve impartiality the jury's deliberative process is shielded from all outside influences. As stated in *People v. Bradford* (2007) 154 Cal.App.4th 1390, 1413–1414 [65 Cal.Rptr.3d 548]: " '[T]he jury's verdict must be based upon the evidence adduced at trial uninfluenced by extrajudicial evidence or communications or by improper association with the witnesses, parties, counsel or other persons.' [Citation.] 'Equally implicit in this constitutional guaranty is the right to have the jury's deliberations conducted privately and in secret, free from all outside intrusions, and extraneous influences or intimidations.' [Citation.] Thus, 'private, confidential deliberations outside of the presence of all nonjurors are an essential feature of the right to an impartial jury . . . .' "

■ To challenge the validity of a verdict based on juror misconduct, a defendant may present evidence of overt acts or statements that are objectively ascertainable by sight, hearing, or the other senses. (*People v. Danks* (2004) 32 Cal.4th 269, 302 [8 Cal.Rptr.3d 767, 82 P.3d 1249]; Evid. Code, § 1150, subd. (a).) No evidence may be presented concerning the subjective reasoning processes of a juror that can neither be corroborated nor disproved; rather, the effect of any misconduct is evaluated based on an objective standard of whether there is a substantial likelihood of juror bias. (*People v. Danks, supra,* at p. 302; *In re Hamilton, supra,* 20 Cal.4th at pp. 294, 296; *In re Carpenter* (1995) 9 Cal.4th 634, 653–654 [38 Cal.Rptr.2d 665, 889 P.2d 985].)

When the record shows there was juror misconduct, the defendant is afforded the benefit of a rebuttable presumption of prejudice. (*People v. Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People v. Loker* (2008) 44 Cal.4th 691, 746–747 [80 Cal.Rptr.3d 630, 188 P.3d 580].) This presumption is provided as an evidentiary aid to the defendant because of the statutory bar against evidence of a juror's subjective thought processes and the reliability of external circumstances to show underlying bias. (*In re Hamilton, supra,* 20 Cal.4th at p. 295; *In re Carpenter, supra,* 9 Cal.4th at pp. 651–652, 657.) If a review of the entire record shows no substantial likelihood of juror bias, the presumption has been rebutted. (*In re Hamilton, supra,* at p. 296; *In re Carpenter, supra,* at p. 653.)

■ Juror bias does not require that a juror bear animosity towards the defendant. Rather, juror bias exists if there is a substantial likelihood that a juror's verdict was based on an improper outside influence, rather than on the evidence and instructions presented at trial, and the nature of the influence was detrimental to the defendant. (*In re Hamilton, supra,* 20 Cal.4th at p. 294; *People v. Honeycutt* (1977) 20 Cal.3d 150, 157–158 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People v. Barton* (1995) 37 Cal.App.4th 709, 719 [43 Cal.Rptr.2d 671].)

The question of what constitutes juror bias varies according to the circumstances of the case. (See *People v. Nesler* (1997) 16 Cal.4th 561, 580 [66 Cal.Rptr.2d 454, 941 P.2d 87].) When, as here, juror misconduct arises from a juror's receipt of extraneous information, juror bias can be inherent or circumstantial. (*People v. Loker, supra,* 44 Cal.4th at p. 747; *People v. Danks, supra,* 32 Cal.4th at p. 303; *In re Carpenter, supra,* 9 Cal.4th at p. 653.) Under the inherent bias test, the court considers whether the "extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror." (*In re Carpenter, supra,* at p. 653; see *People v. Loker,*

*supra,* at p. 747; *People v. Danks, supra,* at p. 303.) Even when the extraneous information is not so prejudicial, in and of itself, as to cause inherent bias, under the circumstantial bias test the court must examine the totality of the circumstances surrounding the misconduct to determine whether a substantial likelihood of actual bias nonetheless arose. (*In re Carpenter, supra,* at p. 654; *People v. Loker, supra,* at p. 747.) The judgment must be set aside if the court finds prejudice under either the inherent or circumstantial bias test. (*In re Carpenter, supra,* at p. 653.) "[B]efore a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial.*" (*Id.* at p. 654.)

Ultimately, the test for determining whether juror misconduct likely resulted in actual bias is "different from, and indeed less tolerant than," normal harmless error analysis. (*People v. Marshall* (1990) 50 Cal.3d 907, 951 [269 Cal.Rptr. 269, 790 P.2d 676]; see *In re Carpenter, supra,* 9 Cal.4th at p. 654.) If the record shows a substantial likelihood that even one juror "was impermissibly influenced to the defendant's detriment," reversal is required regardless of whether the court is convinced an unbiased jury would have reached the same result. (*People v. Marshall, supra,* at p. 951; see *In re Carpenter, supra,* at pp. 651, 654; *In re Malone* (1996) 12 Cal.4th 935, 964 [50 Cal.Rptr.2d 281, 911 P.2d 468].)[4]

On appeal from a ruling denying a new trial motion based on juror misconduct, we defer to the trial court's factual findings if supported by substantial evidence, and exercise our independent judgment on the issue of whether prejudice arose from the misconduct (i.e., whether there is a substantial likelihood of inherent and/or circumstantial juror bias). (*People v. Nesler, supra,* 16 Cal.4th at p. 582 & fn. 5; see *People v. Ault* (2004) 33 Cal.4th 1250, 1263–1264 [17 Cal.Rptr.3d 302, 95 P.3d 523].)

### C. *Analysis*

The Attorney General concedes the juror's conversations with the nonjuror constituted misconduct, and thus a presumption of prejudice arose. Accordingly, the issue before us is whether the presumption of prejudice has been rebutted.

Preliminarily, we note that contrary to the Attorney General's assertion that we must defer to the trial court's factual finding that Juror D. was not biased against defendant if supported by substantial evidence, a trial court's finding

---

[4] In *Carpenter,* the Supreme Court clarified that the strength of the prosecution's evidence may be examined to determine the likelihood of juror bias, but once actual bias has been found the judgment must be reversed regardless of the strength of the evidence. (*In re Carpenter, supra,* 9 Cal.4th at p. 655.)

of no prejudice must be reviewed independently on appeal. (*People v. Nesler,* *supra*, 16 Cal.4th at p. 582 & fn. 5; *People v. Ault, supra*, 33 Cal.4th at pp. 1263–1264.) As explained in *Nesler*, the appellate "court must independently determine whether, from the nature of [the] misconduct and all the surrounding circumstances, there is a substantial likelihood [the juror] was . . . biased, i.e., was unable to put aside her impressions or opinions based upon the extrajudicial information she received and to render a verdict based solely upon the evidence received at trial."[5] (*Nesler, supra*, at pp. 582–583.)

Here, there were no conflicts in the descriptions of juror misconduct that were resolved by the trial court. (Cf. *In re Carpenter, supra*, 9 Cal.4th at p. 646; *People v. Loker, supra*, 44 Cal.4th at p. 749.) The trial court accepted the facts set forth in the declarations submitted with the new trial motion, and then determined that under these undisputed facts the presumption of prejudice was rebutted. Although we defer to factual findings supported by substantial evidence, the legal *import* of the facts accepted by the trial court on the issue of prejudice is subject to our de novo evaluation. Accordingly, we independently review whether the record shows the presumption of prejudice was rebutted because there is no substantial likelihood of juror bias.

The juror misconduct at issue here was both pervasive (occurring every single day of the trial) and substantive (involving deliberative-type discussions about the merits of the case). The discussions between Juror D. and his friend not only violated Juror D.'s sworn obligation to follow the court's instructions not to discuss the case before deliberations and not to discuss the case *at all* with a nonjuror (Code Civ. Proc., § 232; Pen. Code, § 1122), but also contravened defendant's right to 12 jurors free from outside influence (see *People v. Pierce, supra*, 24 Cal.3d at p. 207; *People v. Wilson, supra*, 44 Cal.4th at p. 838). The nature of this misconduct gives rise to serious questions concerning the fairness of the trial.

■ First, Juror D.'s failure to comply with repeated admonitions not to discuss the case casts serious doubts on his willingness to follow the court's other instructions. (See *In re Hitchings* (1993) 6 Cal.4th 97, 120 [24 Cal.Rptr.2d 74, 860 P.2d 466] [" 'When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties.' "];

---

[5] In contrast, when a trial court *grants* a new trial based on a finding of prejudice from juror misconduct, the ruling granting a new trial is subject to deference on appeal with no independent review. (*People v. Ault, supra*, 33 Cal.4th at p. 1265.)

*People v. Leonard* (2007) 40 Cal.4th 1370, 1411 [58 Cal.Rptr.3d 368, 157 P.3d 973].) The court repeatedly reminded the jurors that they were under an absolute obligation not to discuss the case with a nonjuror and emphasized that this was a critical component of a fair trial.[6] Juror D. disregarded this obligation and engaged in ongoing discussions with his nonjuror friend about the case.

█ This is not a case where a juror inadvertently or briefly mentioned something about the case to an outsider. (See, e.g., *People v. Danks, supra*, 32 Cal.4th at pp. 307, 310 [no prejudice from brief conversations between jurors and pastors]; *People v. Zapien* (1993) 4 Cal.4th 929, 994 [17 Cal.Rptr.2d 122, 846 P.2d 704] [no prejudice from juror's inadvertent exposure to outside material concerning case].) Juror D.'s intentional and persistent disregard of the court's instruction not to discuss the case—and in particular not to discuss the case with a *nonjuror*—creates a substantial likelihood that he also gave short shrift to his duty to follow the court's other instructions. Jury adherence to the trial court's instructions—which cover such matters as the burden of proof, the presumption of innocence, the elements of the crime, and the evaluation of witness credibility—is essential to a fair trial. Although we typically presume that jurors follow the court's instructions (*People v. Gray* (2005) 37 Cal.4th 168, 217 [33 Cal.Rptr.3d 451, 118 P.3d 496]), we cannot do so here in the face of the undisputed showing that Juror D. flagrantly disregarded an instruction that he was repeatedly told was essential to the fairness of the trial.

Second, the ongoing and improper communications between the juror and nonjuror about the merits of the case fundamentally compromised the integrity of the jury's deliberative process and undermined the requirement that the jury alone determine whether a defendant is guilty. The conversations between Juror D. and his friend included discussions about whether the victim had a motive to falsely accuse defendant; the implications to be drawn from the fact that defendant would not likely be testifying; their respective views

---

[6] For example, the court variously stated: "For the time that you're jurors, you have an obligation not to talk about this case or anything related to this case. It's part of the process of trying to keep a fair jury." "I've discussed—and will discuss again and again and again—that you can't talk about the case, you can't form or express opinions about it." "Throughout the course of this trial, we have to keep a glass wall around you." "I'm just going over this to belabor again—and I will do that regularly each day—how important it is for you not to talk about the case. . . . [¶] . . . They're key ingredients of your being fair . . . ." "So folks are going to be curious about what you're doing. They'll be asking questions one way or the other expressly, silently. You're going to feel the instinct—I guarantee—to talk about it, and I'm reminding you that you must not." "[T]he opportunities for you to talk about this case, you must not accept."

as to which party was prevailing or should prevail; and the juror's observations concerning the victim's demeanor. The declarations reveal that G. freely shared his opinions with Juror D. about how to evaluate the case, improperly interjecting his views into Juror D.'s consideration of the evidence. These discussions were akin to deliberations that occur in the jury room and violated the constitutional requirement that the case is to be considered and decided solely by the sworn jurors. (*People v. Bradford, supra*, 154 Cal.App.4th at pp. 1413–1414.)

■ Unbeknownst to the prosecutor, defense counsel, and the court, G. was, in effect, a 13th juror who had not undergone the voir dire process to uncover bias. As recognized in *People v. Wilson, supra*, 44 Cal.4th at page 822, "the pretrial voir dire process is important [to protect the constitutional right to an impartial jury] because it enables the trial court and the parties to determine whether a prospective juror is unbiased and both can and will follow the law." Further, G. had not been sworn to try the case on the evidence and instructions, nor had he been present each day of trial to hear the evidence, evaluate witness demeanor, and apply his observations to the controlling law set forth by the court in the instructions. Each of these steps is essential to preserve the defendant's constitutional right to an impartial jury that decides the case on the evidence and under the court's instructions. Defendant was entitled to have his case evaluated by 12 *jurors*, not by 12 jurors and one extra, "invisible," unsworn juror whom Juror D. consulted on a daily basis.

The misconduct arising from these daily, deliberative-type discussions improperly interjected the views of a nonjuror—who had not been vetted through voir dire, had not been sworn to follow the law, and had not heard all the evidence—into Juror D.'s consideration of the case. Although Juror D. did not advise his fellow jurors of his communications with his friend, the fact that one juror was improperly influenced deprived defendant of his constitutional right to be tried by 12 impartial jurors. (See *People v. Nesler, supra*, 16 Cal.4th at p. 578.)

■ Third, the fact that Juror D. and G. discussed the import of defendant's decision not to testify demonstrates that this outside influence was directed to a critical issue and one that was potentially highly detrimental to the defense.[7] As is true in all criminal trials, the jury was instructed that it is not permitted to consider or discuss the fact that defendant exercised his

---

[7] G.'s declaration states that he told Juror D. that guilty people do not testify, whereas Juror D.'s declaration merely refers to his (Juror D.'s) statement that he did not think defendant would testify and G.'s response that certain high-profile defendants who did not testify were acquitted even though they were guilty. Regardless of the precise nature of their discussion, it is clear they discussed defendant's decision not to testify.

constitutional right not to testify. (See CALCRIM No. 355.)[8] This rule is designed to prevent the jury from drawing adverse inferences against the defendant in violation of the constitutional right not to incriminate oneself. (*People v. Leonard, supra,* 40 Cal.4th at pp. 1424–1425.) In some cases the courts have found comments about a defendant's failure to testify to be nonprejudicial misconduct. (See, e.g., *People v. Hord* (1993) 15 Cal.App.4th 711, 726–728 [19 Cal.Rptr.2d 55] [no prejudicial misconduct from jurors' mere mentioning of defendant's failure to testify; comments were transitory without further discussion and foreperson admonished jurors they could not consider the failure to testify]; *People v. Leonard, supra,* 40 Cal.4th at p. 1425 [no prejudicial misconduct from jurors' comments at penalty phase that they wished defendant had testified to assist them better in understanding him; comments were not akin to negative inferences from failure to testify]; *People v. Loker, supra,* 44 Cal.4th at pp. 748–749 [no prejudicial misconduct from jurors' mentioning of defendant's failure to testify during penalty phase; comments were brief and foreperson admonished jurors not to consider this matter].)

■ Unlike the situations in *Hord, Leonard* and *Loker,* the circumstances of this case show the discussion of defendant's decision not to testify carried a high potential of prejudice to the defense. In the absence of physical evidence, sexual molestation cases inevitably turn largely on the jury's evaluation of the victim's credibility. A defendant is entitled to have all 12 jurors make this evaluation without considering whether the defendant took the stand to deny the accusations. The defendant's silence should not be a factor adding to any inferences that the victim is telling the truth. The fact that Juror D. discussed defendant's silence with G. reflects that Juror D. considered this factor. Further, the fact that Juror D. repeatedly ignored clear instructions not to discuss the case supports that he equally ignored the court's instruction not to factor in defendant's silence when deciding the case. This improper influence obviated defendant's constitutional right not to have his silence play any role in his conviction.

■ Juror D. and G. also had discussions concerning whether the victim had a motive to falsely accuse defendant. G. declared that he told Juror D. that unless S. had a motive to make a false accusation, defendant was guilty. Assuming Juror D. heard this statement, this raises further concerns that G.

---

[8] In the language of CALCRIM No. 355, the jury was instructed: "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. *Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way.*" (Italics added.)

was providing Juror D. with inaccurate summations of the law.[9] An absolute statement that a defendant is guilty unless the victim has a motive to fabricate, contravenes the principle that the jury should consider *all* the evidence when determining whether guilt has been proven beyond a reasonable doubt. Contrary to G.'s statement, the absence of the victim's motive to lie, although relevant, is not necessarily determinative on the issue of guilt.

We are not persuaded that the presumption of prejudice was rebutted merely because G. ultimately opined to Juror D. that he thought there was insufficient evidence to support a guilty verdict. Regardless of G.'s eventual expression of an opinion favorable to the defense, the fact remains that during their conversations G. encouraged Juror D. to consider matters that were improper and detrimental to the defense, including the import of defendant's decision not to testify and that defendant was guilty unless the victim had a motive to make a false accusation.

Contrary to the People's assertion, the circumstances of this case are not comparable to those in *People v. Barton, supra,* 37 Cal.App.4th 709, where the court found the improper influence was favorable to the defendants. In *Barton,* a juror and nonjuror (two of the defendants' uncle) had repeated contacts during which the nonjuror attempted to persuade the juror to vote not guilty by appealing to her sympathy, and during deliberations the juror made statements suggesting she was sympathetic to the defendants. Finding no prejudice, the *Barton* court reasoned that although the record showed the juror was impermissibly influenced by outside information, only the People, not the defendants, suffered detriment. (*Id.* at pp. 717–719.) The *Barton* case did not involve a nonjuror who actively and continually participated in the deliberative process with the juror, nor did it involve a discussion of matters detrimental to the defense.

We conclude the record shows a substantial likelihood of juror bias. The content and frequency of the communications between Juror D. and his friend strongly suggest an outside influence detrimental to defendant that was tantamount to inherent bias. Even if the misconduct does not rise to the level of inherent bias, the totality of the circumstances show a substantial likelihood of actual bias. Juror bias exists if a juror is incapable or unwilling to decide the case solely on the evidence before him or her. (See *In re Hamilton, supra,* 20 Cal.4th at p. 294.) By discussing the merits of the case *every single day* with G., Juror D. engaged in conduct that persistently disregarded the court's instructions. Juror D.'s pervasive, deliberative-type communications

---

[9] Juror D.'s declaration refers to a discussion of S.'s possible motives to lie, but does not refer to a precise statement by G. that defendant was guilty unless S. had a motive to lie.

with G. create a substantial likelihood that he was unwilling to decide the case solely on the evidence and instructions at trial. Also, because the discussions included matters that carried a high potential of detriment to the defense, there is a substantial probability that Juror D.'s impartiality towards defendant was compromised.

 Our Supreme Court has made clear that a guilty verdict based on the vote of even *one* biased juror cannot be sustained, regardless of whether an unbiased jury would have reached the same result. (*In re Carpenter, supra,* 9 Cal.4th at p. 654.) "A defendant is 'entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' " (*People v. Nesler, supra,* 16 Cal.4th at p. 578, original brackets.) The record shows the sanctity of the deliberative process and the right to an impartial jury was prejudicially tainted by Juror D.'s misconduct. The presumption of prejudice has not been rebutted, and defendant is entitled to a new trial.

## II. *Additional Issues upon Retrial*

For guidance upon retrial, we address two other issues raised by defendant on appeal.

### A. *Defense Request to Examine the Victim's Diary**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *No Constitutional Requirement of Unanimity for Acts Constituting Continuous Sexual Abuse*

 Defendant contends the trial court violated his constitutional rights by failing to give a unanimity instruction for the count 1 offense of continuous sexual abuse of a child under age 14. (§ 288.5.) Section 288.5, subdivision (a) defines the offense as committed when the defendant engages in three or more acts of substantial sexual conduct or lewd acts with the child over at least a three-month period. Section 288.5, subdivision (b) dispenses with the need for the jury to unanimously agree on the same three acts, stating: "To convict under this section the trier of fact, if a jury, need unanimously agree only that the requisite number of acts occurred not on which acts constitute the requisite number." Challenging this provision,

---

*See footnote, *ante*, page 1105.

defendant contends he is constitutionally entitled to a unanimous jury determination on each act that establishes the section 288.5 violation.

As recognized by defendant, in *People v. Gear* (1993) 19 Cal.App.4th 86, 89 [23 Cal.Rptr.2d 261], this court rejected a constitutional challenge to section 288.5, subdivision (b). In *Gear*, we explained: "The general rule is that the jury must unanimously 'agree upon the commission of the same act in order to convict a defendant of a charged offense.' . . . [¶] This fundamental rule has presented vexing proof problems in cases involving . . . persons who reside with a minor or have unchecked access to a minor and are charged with repeatedly sexually molesting the minor over a prolonged period of time. . . . [¶] Section 288.5, creating the new crime of continuous sexual abuse of a child, was the Legislature's response . . . . [¶] . . . [¶] The crime of continuous sexual abuse of a child (§ 288.5) is a continuous-course-of-conduct crime and therefore falls within the exception to the rule that jurors must agree on the particular criminal acts committed by the defendant before convicting him." (*People v. Gear, supra,* at pp. 90–92, citation omitted.) The continuous-course-of-conduct exception to the unanimity requirement applies when, as here, the statute contemplates a continuous series of acts over a period of time. (*Id.* at pp. 91–92.) There is no violation of the constitutional right to unanimous agreement on the criminal conduct because the actus reus of the offense is the course of conduct, not a specific act. (*Id.* at pp. 92–93.) " 'The agreement required for conviction is directed at the appropriate *actus reus*: unanimous assent that the defendant engaged in the criminal course of conduct.' " (*Id.* at p. 93; accord, *People v. Whitham* (1995) 38 Cal.App.4th 1282, 1295–1298 [45 Cal.Rptr.2d 571].)

To support his constitutional challenge to section 288.5, defendant cites *People v. Jones* (1990) 51 Cal.3d 294 [270 Cal.Rptr. 611, 792 P.2d 643], a case which concerns the section 288 lewd conduct offense. As we stated in *Gear*, reliance on *Jones*'s analysis to evaluate section 288.5 is "akin to comparing apples with oranges." (*People v. Gear, supra,* 19 Cal.App.4th at p. 93.) The defendant in *Jones* was charged with several counts of lewd conduct on a minor (§ 288, subd. (a)) committed during various time periods, and the charges were supported by "generic" testimony from the child that did not distinguish between the individual acts occurring over an extended period of time. (*People v. Jones, supra,* at pp. 299–300, 321.) The *Jones* court overruled several appellate court decisions that had found such generic testimony violated the defendant's right to a unanimous jury verdict because it would be impossible for the jury to agree on specific acts that constituted the crime. (*Id.* at pp. 299–300, 308–309, 322.) The *Jones* court concluded that there was no constitutional impediment to allowing a jury to find a defendant guilty of more than one indistinguishable act as long as the victim's testimony described the nature of the sexual acts, the frequency of the acts, and the general time period for the acts. (*Id.* at pp. 316, 321.) Further, the court in

*Jones* directed that the jury be given a modified unanimity instruction, stating: "[W]hen there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*Id.* at p. 322.)

■ Because *Jones* does not concern the continuous-course-of-conduct offense defined by the Legislature in section 288.5, its directive that the jury must unanimously agree that the defendant committed all the acts described by the victim does not apply to this section.[14] Unlike the section 288 offense at issue in *Jones*, section 288.5 contains specific requirements that define its parameters, including the requirement of three predicate acts over a three-month time period, and a limitation of one count per victim under the section. (See *People v. Jones, supra,* 51 Cal.3d at p. 329 (dis. opn. of Mosk, J.) ["The Legislature, in enacting section 288.5, created several safeguards designed to balance the state's compelling interest in prosecuting the resident child molester with the protection of a criminal defendant's rights."].) There is nothing in *Jones* that suggests the Legislature's decision to dispense with the unanimity requirement for the three predicate acts is unconstitutional, or that there is a constitutional imperative that the modified unanimity requirement formulated in *Jones* must be imposed on a section 288.5 offense. (*People v. Higgins* (1992) 9 Cal.App.4th 294, 300–301, 304–305 [11 Cal.Rptr.2d 694]; *People v. Gear, supra,* 19 Cal.App.4th at pp. 93–94.)

■ We are likewise unpersuaded by defendant's contention that the United States Supreme Court's holding in *Richardson v. United States* (1999) 526 U.S. 813 [143 L.Ed.2d 985, 119 S.Ct. 1707] supports that section 288.5, subdivision (b) is unconstitutional. In *Richardson,* the court, as a matter of statutory interpretation, concluded that a federal offense requiring a series of drug offenses to prove a continuing criminal enterprise required unanimous agreement as to which three specific drug transactions supported the conviction. (*Richardson, supra,* 526 U.S. at pp. 815–818.) In reaching this conclusion, *Richardson* noted that "the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks

---

[14] The *Jones* court acknowledged that the Legislature had recently enacted section 288.5, and merely noted that the section could face a due process challenge if the appellate court decisions (disapproved in *Jones*) were valid. (*People v. Jones, supra,* 51 Cal.3d at pp. 310–311.)

support in history or tradition." (*Id.* at p. 820.) However, citing and distinguishing the *Gear* decision, the *Richardson* court recognized that this constitutional concern did not necessarily apply to state statutes that involved difficult problems of proof. *Richardson* noted that state statutes that permit conviction for sexual abuse of a minor based on a continuous course of conduct "may well respond to special difficulties of proving underlying criminal acts, *People* v. *Gear, supra,* [19 Cal.App.4th] at [pp.] 90–92, . . . which difficulties are absent here." (*Id.* at p. 821.) Thus, *Richardson* supports the constitutionality of the continuous-course-of-conduct exception applied by the Legislature in section 288.5, subdivision (b). (See *State v. Sleeper* (2004) 150 N.H. 725 [846 A.2d 545, 548–550] [*Richardson* does not invalidate state's continuous-course-of-conduct sexual abuse offense]; *State v. Johnson* (2001) 243 Wis.2d 365 [627 N.W.2d 455, 462–464] [same].)

■ To the extent defendant suggests the continuous-course-of-conduct exception runs afoul of the *Apprendi*[15] rule, the contention fails. The *Apprendi* rule requires that each element of the offense be found by the jury beyond a reasonable doubt, and prohibits a state from circumventing this rule by reclassifying elements of an offense as sentencing factors to be determined by a judge. (*Apprendi v. New Jersey, supra,* 530 U.S. at pp. 477, 491–496.) Defendant has not cited any authority suggesting that the *Apprendi* rule is violated when the state, because of unique problems of proof, classifies a continuous course of conduct as the element of the offense which must be found by a unanimous jury, while classifying the specific underlying acts as the means of committing the crime which need not be found by a unanimous jury. (See *People v. Napoles* (2002) 104 Cal.App.4th 108, 116 [127 Cal.Rptr.2d 777] [no unanimity instruction required regarding " 'the exact way the defendant is guilty of a single discrete crime' "].) Section 288.5 permissibly defines the operative element as a continuous course of at least three acts, and defines the three specific acts as the means of committing the crime. (*People v. Higgins, supra,* 9 Cal.App.4th at p. 307 ["the number of acts of molestation is an essential element of the crime; unanimity on which acts . . . is not"].) This does not constitute a violation of the *Apprendi* rule.

### III. *Remaining Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[15] *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].
*See footnote, *ante,* page 1105.

## DISPOSITION

The judgment is reversed.

McConnell, P. J., and Irion, J., concurred.

A petition for a rehearing was denied March 25, 2010, and the opinion was modified to read as printed above.