Filed 4/13/16  P. v. Sandoval CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B263358 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA428431) |
| v. | |
| RANDY SANDOVAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Elliott Veals, Judge.  Affirmed.

Joshua L. Siegal, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant, Randy Sandoval, guilty of one count of continuous sexual abuse of a child (Pen. Code § 288.5, subd. (a)[1], [count 7]); three counts of lewd acts upon a child under the age of 14 (§ 288, subd. (a), [counts 8-10]), two counts of forcible rape of a child victim over the age of 14 years (§ 261, subd. (a)(2) [counts 11 & 12]), and one count of lewd acts upon a child of age 14 or 15 years (§ 288, subd. (c)(1) [count 13]).[2]  The jury also found true the allegation that defendant committed substantial sexual conduct with a victim under the age of 14 years in counts 8, 9, and 10.  (§ 1203.066, subd. (a)(8).)  Defendant was sentenced to 44 years 8 months in state prison.

Defendant contends that statements he made in an interview with police were coerced, and he did not testify due to the trial court's erroneous ruling that the involuntary statements would be admissible for impeachment purposes if defendant testified.  He also argues that section 288.5 is unconstitutional because it does not require juror unanimity on the acts that constitute the offense.

We affirm the judgment.


## FACTS[3]


Defendant sexually abused his stepdaughter, Ashley S., several times a week from the time that she was around 7 or 8 years old until she was 11 years old by touching her breasts and vagina and inserting his finger into her vagina.  The incidents took place in

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] The trial court granted the prosecution's motion to dismiss counts 1-6 prior to trial.  Counts 7-13 of the amended information were renumbered as counts 1-7 for trial.  The verdicts refer to counts 1-7, but the counts were referred to as 7-13 at sentencing.  Because both parties refer to the counts as 7-13, we will do the same.

[3] We include only a brief summary of the facts, as defendant has not challenged the sufficiency of the evidence supporting his conviction.

the bottom bunk of the bunk bed where her family slept while Ashley's sister S. was asleep in the top bunk, and her mother was at work. When she was about 13 years old, defendant made Ashley orally copulate him several times. He also inserted his finger into Ashley's vagina, put her hand on his penis, and had sexual intercourse with her on multiple occasions when she was 13. One time, when Ashley tried to prevent him from making her have sexual intercourse with him, he slapped her. This continued until Ashley was about 14 years old and her mother stopped working outside of the house.

Defendant moved out of the family home when Ashley was about 15. She and S. would occasionally spend the night with him. Defendant made Ashley sleep in his bed, and sometimes grabbed her butt. Ashley eventually reported the abuse to her mother, Olga A., who confronted defendant. He denied Ashley's accusations initially, but when Olga called him later, he admitted that everything Ashley said was true. Ashley reported the abuse to the police a few months later. The police had Olga call defendant, and recorded the call. Defendant admitted to some of the abuse, but said that he did not force Ashley or penetrate her vagina with his penis.

## DISCUSSION

**Police Interview**

Defendant contends that admissions he made in an interview with the police were coerced. He was prejudiced when the trial court denied his motion to exclude the police interview, because he decided not to testify on his own behalf as a result.

The Interview

On August 20, 2014, defendant was arrested and questioned by Detective Maria Singh and Officer Knight at the police station. The officers explained their questioning

3

procedures, verified that defendant understood why he was being questioned, and advised him that he could take a break at any time.

Detective Singh advised defendant of his *Miranda*[4] rights, which defendant waived. Detective Singh assured defendant: "[T]he reason [we are] all here is we're here to get the truth and we're here so that we can get your family to move past what's happened."

Defendant became unresponsive when Detective Singh began asking about his relationship with Ashley. She said, "Randy, I can see this is difficult for you. I truly can. But the only way to move forward is to talk about this. . . . [¶] . . . [W]hen we admit that we made the mistakes then we can move on. But until you can talk about it and we can move on you're going to stay here. Right here where you're at. Look at me. Right here where you're at. You're not going to be able to release this. And that's not good for you. It's not healthy. It's not going to allow you to move forward. To move. Get you out of this rut that you're in right now." She reiterated "[A]ll I'm asking is that you be honest. Because that's what we're here for." The detective urged defendant to do as he had taught his daughters to do and be truthful, because that was what they needed from him.

Soon afterwards, defendant asked Detective Singh if she could step back. She responded that she would immediately.[5]

Both detectives urged defendant to tell the truth so his daughters could begin to move on and defendant's conscience would be clear. Defendant admitted to touching Ashley's breasts and vagina with his hands, and to putting his finger in her vagina, but he denied having sexual intercourse with her and denied making her orally copulate him.

The detectives asked why Ashley would accuse him and why Olga said he admitted to committing the acts if it was untrue. Defendant asked how the detectives would help him if he confessed. Detective Singh responded: "[We can help to] get you

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[5] There were no other indications that defendant was uncomfortable with the officers' proximity to him or felt threatened during their conversation.

4

past this. Because those ideas in your head are always going to be there until it's finally out. It's out in the open. It's clear. You have to clear your head of it so that you can move forward."

Detective Singh again urged defendant to be honest: "You have two girls who are in desperate need of not just therapy, but of the truth." Defendant admitted that his penis touched Ashley's vagina. He was able to keep the molestation a secret by telling her it was between the two of them. He did not threaten or force her. It was true that Ashley was seven or eight years old when he began touching her. Defendant denied pushing Ashley's head down to orally copulate him. He did not respond when the officers asked if he had made Ashley masturbate him. They suggested that Ashley needed to talk about it and that defendant might need to as well. Detective Singh said, "You asked me if this is going to help her. The truth is going to help her." Defendant did not respond. Then he asked Detective Singh how she would help him afterward. Detective Singh responded, "How am I going to help you? Basically, I'm going to write everything that you said. [¶] . . . [¶] And I'm going to put that you were truthful, you were emotional. And I wouldn't be lying. I'm going to write the truth. And that's how that's going to help you. I am -- I am a detective, okay. Once I'm done with my paperwork then I turn it over to -- to that group of people that I told you. And they're the ones that review everything. [¶] But the truth always helps, Randy."

Defendant asked what the officers were doing for his daughters. Detective Singh responded that she was trying to get them to go to therapy and assist them with school issues. She reassured the girls that Ashley was not alone, and that they could move forward. What the girls really needed was for defendant to tell the truth and stop denying Ashley's allegations. Defendant asked about Ashley's grade point average. Detective Singh said that Ashley's grade point average did not matter at that time, but that defendant answering her questions did matter. Defendant did not answer. Detective Singh continued, "Do you want your family to know? Do you want me to go to your family? Is this not something that should stay within your own family?"

Defendant continued to avoid answering the officers' questions about the specific acts Ashley accused him of committing. Finally, Detective Singh asked, "Is she lying?" Defendant said, "On one part, yes." Officer Knight advised defendant that, "the only way you can help yourself is by saying the truth. And you will see that that backpack of lies that you've been carrying all these years once you tell the truth it's going to be lifted from your shoulders. Because you took responsibility and helped your little girl." Soon afterward, Detective Singh stated: "[O]nce this is over with you won't have to be looking over your shoulders are the police looking for me? Is my daughter going to -- [¶] . . . [¶] Is my daughter going to approach me? Am I going to be able to look at my daughter face-to-face and wonder if she still remembers? Wonder if she's going to ask me why did you do this?" Defendant said that he was confused and didn't remember what happened.

Defendant then said, "[w]hen you brought this up earlier you said it's going to keep in the family. I don't understand that." The detective explained: "Within your family. Your girls your -- Olga, that's your family. [¶] . . . [¶] That's what I'm talking about your family. You want to keep this within your family. [¶] . . . [¶] You don't want your family to go out looking for answers from, I don't know, your parents. . . . [¶] . . . [¶] You don't want your daughters to asking your siblings, hey, why do you think my dad did this to me, do you? You want them to hear it come from you. You want to keep this within your family unit. And rightly so. They should keep it within your family. They should be able to come to you or get answers from you good, bad, or indifferent. And that's what we're here for. . . ."

Detective Singh reiterated that telling the truth would help both of his daughters move on, although there was no guarantee of a future relationship with them: "[W]e're not lying to you. We're not telling you it's going to get fixed tomorrow. That your daughters are going to come running to you." Defendant said he understood.

Defendant asked what answer his daughters were looking for. Detective Singh said his daughters didn't want him to deny what happened. They wanted him to believe in them, and they wanted to know that he did not think Ashley was a liar. She asked

6

defendant if Ashley had told the truth. Defendant said not everything was true, but he felt that the officers were saying that if he didn't admit to everything he would be calling Ashley a liar. Officer Knight responded: "The truth[']s the truth; right?" Defendant agreed. The officer assured him: "That's all we want."

Detective Singh asked why defendant had confessed to Olga that he did everything he was accused of doing. He explained that at the end of their conversation he told Olga he did everything because "[i]t was too hard." He did not do everything Ashley had accused him of doing. Detective Singh summarized what defendant had told the officers at that point and asked if her summary was correct. Defendant confirmed that it was. Detective Singh then asked defendant if he put his penis into Ashley's vagina or had her orally copulate him. Defendant denied both. He also denied using force. Detective Singh rephrased her questions, and defendant again denied having intercourse with Ashley or having her orally copulate him.

The officers advised defendant he could make a phone call, and that an appointed attorney would meet with him the next day.

Proceedings

Before trial, defendant moved to suppress the police interview on the bases that he was not properly advised of his *Miranda* rights and that his inculpatory statements were involuntary. The prosecutor represented that he did not intend to use the statements in his case in chief. As a result, the trial court did not rule on the motion. After the prosecution rested, the defense requested a ruling on whether defendant's statements in the interview could be used for impeachment. The trial court ruled that, to the extent defendant's testimony was inconsistent with his statements in the police interview, they could be used to impeach him. Defendant chose not to testify in his own defense.

Law

7

"'[B]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' [Citations.] As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the evidence the voluntariness of a confession. [Citations.] [¶] . . . Where . . . an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 551 (*Duff*).)

"'"'A statement is involuntary if it is not the product of '"a rational intellect and free will."' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'"'" [Citation.] In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including "'"the crucial element of police coercion,"'" the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health. [Citation.]" (*Duff*, *supra*, 58 Cal.4th at pp. 555-556.) "A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

In *People v. Hill* (1967) 66 Cal.2d 536, 549, our Supreme Court explained: "The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.' [Citation.] . . . [¶] When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of

8

the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear."

Discussion

Having reviewed the record independently, we conclude that defendant's statements to police were not involuntary. The officers made no promises of leniency or threats of punishment. They repeatedly urged defendant to tell the truth because it would unburden his conscience and help his family move on. These are benefits that flow naturally from telling the truth. They do not indicate coercion. Detective Singh very clearly explained that she could not do anything for defendant beyond helping him to unburden himself. As a detective, she would faithfully record what defendant said, but she had no authority to make decisions regarding him. She said she could not promise that his daughters would forgive him, only that the truth would help them in their healing process. The officers did not threaten to "go public" with the allegations against defendant. They advised defendant that if he was not truthful, Ashley might go to his parents and siblings with questions about why her father molested her, and that it would be better if she heard the truth from him. This, too, would be a natural consequence. Similarly, if defendant denied her allegations, it would be a normal response for Ashley to feel defendant was being hypocritical and calling her a liar. Defendant understood this, but was ultimately not swayed by it. He maintained throughout the interview that Ashley was not telling the whole truth. He never admitted to sexual intercourse or oral copulation with her.

The record does not suggest the officers were physically coercive. At one point, defendant expressed that he was uncomfortable with Detective Singh's proximity to him. He asked her to step back and she complied immediately. There was no other indication in the record that the officers were threatening or standing too close to defendant, nor

9

does defendant point to any other instance in his argument. There is nothing about defendant's nature or the circumstances that would lead us to believe that a single invasion of personal space would have been sufficient to cause defendant's will to be overborne.

Defendant was not led to believe that he would not be allowed to leave the police station until he confessed. Viewed in context, Detective Singh's statement that defendant would be staying right where he was if he did not talk about what happened, did not mean defendant would be staying in the interview room. She was advising defendant that his psychological state was unhealthy. He would not be able to move on emotionally if he was not truthful. Detective Singh reminded defendant: "[A]ll I'm asking is that you be honest. Because that is what we are here for."

Considering the totality of the circumstances, we conclude that defendant's admissions in the interview were voluntary. The trial court did not err in denying defendant's motion to exclude his interview with police.

**Section 288.5**

Defendant was convicted in count 7 of continual sexual abuse of a child under section 288.5, subdivision (a), based on Ashley's testimony that defendant committed five different types of qualifying acts within the requisite three-month time period, and that each type of act happened multiple times. Defendant's motion to dismiss count 7 was denied. On appeal, defendant contends that section 288.5 is unconstitutional because it does not require juror unanimity as to which specific acts form the basis of the offense. Defendant acknowledges that the question of whether the statute is unconstitutional has been resolved in the negative by numerous courts, but argues that those cases were wrongly decided. We agree with our many sister courts that the contention is without merit.

Law

10

"'[T]he Due Process Clause [of the United States Constitution] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' [Citation.]" (*People v. Whitham* (1995) 38 Cal.App.4th 1282, 1297.) However, "the United States Supreme Court 'has never held jury unanimity to be a requisite of due process of law.' [Citations.]" (*Id*. at p. 1298.)

"In California, a jury verdict in a criminal case must be unanimous. [Citations.] Thus, our Constitution requires that each individual juror be convinced, beyond a reasonable doubt, that the defendant committed the *specific* offense he is charged with. [Citation.]" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 569.) "'The need for jury unanimity in criminal prosecutions is of state constitutional origin. [Citations.]' [Citation.] An established exception to the unanimity requirement is the situation where ""'the statute contemplates a continuous course of conduct of a series of acts over a period of time.'"" [Citation.]" (*People v. Adames* (1997) 54 Cal.App.4th 198, 207 (*Adames*).)

"This is precisely the essence of section 288.5, which creates 'the offense of continuous sexual abuse' based on 'three or more acts of substantial sexual conduct . . ., as defined in subdivision (b) of Section 1203.066, *or* three or more acts of lewd or lascivious conduct under Section 288, with a child under the age of 14 . . . .' [Citations.] 'Section 288.5 therefore "falls within the exception to the rule that jurors must agree on the particular criminal acts committed by the defendant before convicting him." . . .' [Citation.]" (*Adames*, *supra*, 54 Cal.App.4th at p. 207.) Its provision for conviction without unanimity as to the acts underlying the criminalized conduct is constitutional under both state and federal law. (See *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1123-1126 [federal and state]; *People v. Whitham*, *supra*, 38 Cal.App.4th at pp. 1294-1297 [federal and state]; *Adames*, *supra*, at pp. 207-208 [federal]; *People v. Gear* (1993) 19 Cal.App.4th 86, 89-94 [state]; *People v. Avina* (1993) 14 Cal.App.4th 1303, 1308-1314 [state]; *People v. Higgins* (1992) 9 Cal.App.4th 294, 299-308 (*Higgins*) [state].)

<u>Discussion</u>

Defendant argues that section 288.5 differs from other course-of-conduct offenses such as child abuse (§ 273a), animal cruelty (§ 597), accessory after the fact (§ 32), and dissuasion of a witness, because "[n]one of these . . . offenses require that a specific minimum number of specifically defined qualifying acts be committed over a specific period of time . . . ." He further asserts that section 288.5 differs because each qualifying act is itself criminal, and can be completed immediately unlike "allowing a child to be placed in danger, not feeding an animal, concealing a felon, or dissuading a witness from testifying, which can occur over a period of time." Because of these distinct features, he urges us to conclude continuous sexual abuse is a composite crime, consisting of three or more individual crimes committed over a three-month period, and that these individual crimes must be found by the jury beyond a reasonable doubt.

"'The continuous-course-of-conduct crime does not require jury unanimity on a specific act, because it is not the specific act that is criminalized.' (*People v. Jones* (1990) 51 Cal.3d 294, 329 [(*Jones*)].)" (*Adames*, *supra*, 54 Cal.App.4th at p. 208.) The conduct that is criminalized by section 288.5 is the *continuous* sexual abuse of the child, which is defined as consisting of a *minimum* of three or more acts of substantial sexual misconduct or lascivious conduct under section 288. Each juror must be convinced beyond a reasonable doubt that the conduct took place—i.e. that three or more such acts occurred—not that specific acts took place at a specific time. Continuous sexual abuse of a child does not occur instantaneously. It is a pattern that occurs over time. If anything, the requirement that three or more acts occurred over a specific period of time protects the defendant by "set[ting] a baseline for the crime of continuing sexual abuse, making clear that a defendant may not be convicted of that crime without substantial evidence that he engaged in a repetitive pattern of abusive acts[,]" and requiring that the statute not be "used against individuals who have only transient contact with the alleged victim." (*Higgins*, *supra*, 9 Cal.App.4th at p. 304-305, quoting *Jones*, *supra*, 51 Cal.3d at p. 329.)

12

We see no reason to depart from the well-reasoned precedent holding section 288.5 constitutional.

## DISPOSITION

The judgment is affirmed.


KRIEGLER, Acting P. J.


We concur:


BAKER, J.


KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.