Filed 3/6/13  P. v. Lavender CA4/1
Opinion following remand from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, | D057655 |
| | D057686 |
| Plaintiff and Respondent, | |
| v. | |
| | (Super. Ct. Nos. JCF21566, |
| FLOYD LAVENDER et al., | JCF21567) |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Imperial County, Donal B. Donnelly, Judge.  Reversed.

A jury convicted defendants Floyd Lavender and Michael Gaines of the kidnapping (Pen. Code,[1] § 207, subd. (a)) and first degree murder (§ 187, subd. (a)) of Courtney Bowser, and the torture (§ 206) of Bowser and two other victims (Kristen

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

Martin and Michael Hughes) during the same alleged crime spree. The court sentenced each defendant to an indeterminate term of 25 years to life on the murder charge and a consecutive five-year determinate term for the kidnapping conviction. The court also sentenced each defendant to three life terms on the torture counts, to run concurrently with each other but consecutive to the term for the murder conviction.

On appeal, defendants argue the evidence was insufficient to support the convictions, and there were other errors, including the claim the jury engaged in prejudicial misconduct because the jurors discussed during deliberations the adverse inference to be drawn from fact the defendants did not testify on their own behalf, and it was therefore error to deny their new trial motion based on juror misconduct. They also assert (1) the pretrial identification procedures were unduly suggestive and therefore tainted the in-court identifications; (2) the court erroneously instructed the jury under CALCRIM No. 315 that a witness's level of confidence in his or her identification is a factor to be weighed when assessing the accuracy of that identification; (3) the court erroneously admitted expert testimony that relied on hearsay in violation of *Crawford v. Washington* (2004) 541 U.S. 36 and *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305; (4) the prosecutor engaged in acts of misconduct during closing argument, including adverting to defendants' failure to testify; and (5) because of the weakness of the evidence, these errors and misconduct warrant a finding there was cumulative error rendering defendants' trial fundamentally unfair.

In our original opinion, filed July 10, 2012, we concluded that, although there was sufficient evidence from which *a* jury could have found defendants guilty, the

2

misconduct by *this* jury in discussing the adverse inference to be drawn from defendants'

failure to testify was presumptively prejudicial, and the record in this case was inadequate

to rebut that presumption. Accordingly, we reversed the judgment and remanded the

matter for a new trial.[2] However, after the People unsuccessfully petitioned this court for

a rehearing, based on the argument that our disposition was incorrect and the correct

disposition should instead be to remand to the trial court with directions to conduct a new

evidentiary hearing under *People v. Hedgecock* (1990) 51 Cal.3d 395 (*Hedgecock*) and to

then revisit the new trial motion based on this new evidentiary record as authorized by

*People v. Perez* (1992) 4 Cal.App.4th 893, 905-909 (*Perez*),[3] the People petitioned for

---

[2]    Because we reversed based on juror misconduct, we did not address the balance of defendants' claims of error except their claim of insufficient evidence, because that claim, if successful, would bar retrial under double jeopardy principles. (See, e.g., *People v. Seel* (2004) 34 Cal.4th 535, 550.)

[3]    This argument--that we should order remand to the trial court with directions to conduct a new evidentiary hearing under *Hedgecock* and then conduct a de novo hearing on the new trial motion under *Perez*--was nowhere mentioned in the People's brief on appeal, which is ordinarily fatal to a petition for rehearing. (*Smith v. Crocker First Nat. Bank of San Francisco* (1957) 152 Cal.App.2d 832, 837 ["Counsel are not permitted to argue their cases in a piecemeal fashion and points not previously argued will not be considered where raised for the first time on petition for rehearing."]; *A. F. Estabrook Co. v. Industrial Acc. Com.* (1918) 177 Cal. 767, 771 ["No such point was suggested in the argument on which the petitioners submitted the cases for decision. It is the settled rule of this court that points made for the first time on petition for rehearing will not be considered."]; *Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 276 [ordinarily "[i]t is much too late to raise an issue for the first time in a petition for rehearing"].) This ordinary rule of preclusion was particularly applicable to the People's petition for rehearing, because the *Hedgecock* hearing the People newly championed in their petition for rehearing, as well as in their petition for review to the Supreme Court, was the precise hearing the People's appellate brief in the original appeal had argued was properly denied by the trial court below because (according to that brief) once "the court determined that appellants' jurors had discussed their decision to forgo testifying, there

3

review to our Supreme Court. By its order of October 24, 2012, the Supreme Court granted the People's petition, and directed that we vacate our decision and "reconsider the cause in light of *People v. Bryant* (2011) 191 Cal.App.4th 1457, 1462-1471 [(*Bryant*)], *People v. Von Villas* (1992) 11 Cal.App.4th 175, 251-261 [(*Von Villas*)], and [*Perez, supra,* 4 Cal.App.4th 893, 905-909]." We have examined *Perez,* as well as its progeny *Bryant* and *Von Villas,* and conclude those cases are both distinguishable and involve questionable legal reasoning that should not be perpetuated, and therefore our original disposition should remain unchanged.

After reconsideration, we remain convinced the misconduct by this jury in discussing the adverse inference to be drawn from defendants' failure to testify was presumptively prejudicial and, because the evidentiary basis for the guilty verdict appeared diaphanous and was in many respects in disarray, the record in this case is inadequate to rebut that presumption. We reverse the judgment and remand the matter for a new trial.

---

was no other 'factual' issue to resolve," and "[s]ince the court had already found that misconduct occurred, an evidentiary hearing under *Hedgecock* was unwarranted." (Respondents Brief, pp. 20, 19.) Thus, overtones of judicial estoppel (see fn. 32, *post*) further militated in favor of precluding the issue from being raised on a petition for rehearing. While this rule of preclusion ordinarily carries forward in a petition for review (Cal. Rules of Court, rule 8.500(c)(1); *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 379; *Gavaldon v. DaimlerChrysler Corp.* (2004) 32 Cal.4th 1246, 1265), the Supreme Court has discretion to reach issues otherwise forfeited (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 901, fn. 5 ["In a number of cases, this court has decided issues raised for the first time before us, where those issues were pure questions of law, not turning upon disputed facts, and were pertinent to a proper disposition of the cause or involved matters of particular public importance."]), and has directed this court to do so here.

4

I

FACTUAL BACKGROUND

In late August 2003, Bowser's lifeless body was found in an irrigation canal in Imperial County, California, although it remained unidentified for two and one-half years. The prosecution's theory of how she died, and the identities of the persons responsible for placing her body into the canal, was diametrically opposed to the defense theory of events. The prosecution, relying largely on the testimony of a group of methamphetamine users (including Martin and Hughes) with Bowser when she was last seen alive, alleged defendants became enraged when one of the methamphetamine users stole valuable checks belonging to defendants, and that they tortured Bowser, Martin and Hughes (and ultimately murdered Bowser) in an effort to recover the checks.

In contrast, the defense argued Bowser had engaged in a multiple-day methamphetamine party with the prosecution's principal percipient witnesses, and died from a drug overdose, and these witnesses then panicked and disposed of her body. The defense argued the numerous discrepancies (both internally and when compared to other evidence) in the versions given by prosecution witnesses showed that the methamphetamine party participants, who for many years remained silent about Bowser's disappearance, waited until her body was identified to concoct a story designed to scapegoat the two African-American defendants for Bowser's death.

A. Prosecution Version

*The Methamphetamine Party*

While residing at Juvenile Hall, Martin met Hughes and they became friends. Martin also met Thayne Tolces at Juvenile Hall. Tolces and Hughes were longtime friends. Hughes was released from Juvenile Hall on August 2, 2003, Tolces was released from Juvenile Hall three days later, and Martin was released from Juvenile Hall on August 14, 2003.

Martin visited Hughes and Tolces (either the day Martin was released from Juvenile Hall or the following day) at an apartment in Palm Desert, California, where Hughes and Tolces were living. They decided to visit Angela Vereen at her apartment. When they arrived at Vereen's apartment, Bowser was already there. Vereen supplied the group with methamphetamine. Hughes believed they spent the better part of the next four days[4] playing video games and consuming methamphetamine.

*The Theft and Defendants' Involvement*

At some point, Vereen noticed that some "blank" American Express traveler's checks, which she had left on her desk, were missing.[5] Gaines had entrusted these blank

---

[4]    In contrast to Hughes, Tolces and Martin believed they spent only one evening at Vereen's apartment, while Vereen believed it was a day or two but she could not remember.

[5]    Martin testified the checks were extremely valuable, because Vereen at some point told her the checks were worth $250,000, even though (according to Vereen) the checks were blank. The genesis of these blank checks is unclear, because the prosecution produced no evidence of any reported thefts of blank traveler's checks. On cross-examination, Vereen (who testified on direct examination that she had only met Gaines

checks to Vereen a few days earlier.[6] Vereen immediately called Gaines to report the suspected theft. Defendants were angry because a "high-powered" person from Los Angeles was coming to get the checks, and if the checks could not be produced, they would be "capped." Vereen suspected one of the meth users might have taken the checks.[7] Vereen then called Hughes at his apartment and told Hughes that he, Tolces and Martin needed to return to her apartment right away.[8]

As Hughes and Tolces were climbing the stairs towards Vereen's apartment, Vereen was yelling at them, saying, "You guys fucked up. . . . Where are the checks at?" and "[Gaines is] coming over [here right] now so you guys messed up." Hughes got

---

"a few times" and "all those meetings [were] pretty much drug transactions"), could not articulate any reason why Gaines would have entrusted her with stolen travelers checks for safekeeping.

[6]   Vereen was interviewed by police on multiple occasions. In one interview, she told police she had been holding the checks for about 45 days. The precise number of checks she claimed to have received from Gaines also varied.

[7]   Vereen told police in February 2008 that she had shown the blank checks to Tolces and Hughes because Gaines had asked her if she knew anyone who might be able to cash them, and Vereen therefore asked Tolces and Hughes if they could cash them. Tolces testified the first time he met Gaines was at Vereen's apartment, where they discussed whether Tolces (or anyone he knew) had the ink necessary for forging the checks.

[8]   According to Tolces's version, "the girls" (Martin and Bowser) were *not* with him and Hughes when Vereen contacted them by telephone demanding they return, and that it was he and Hughes who then went to Vereen's apartment. However, Martin's version was that she *was* at Hughes's apartment with Tolces and Hughes when the telephone call from Vereen came in, and she could not remember if just she and Hughes responded by going to Vereen's apartment, or whether Tolces also went. Hughes's version was that he did not voluntarily respond to Vereen's demand, but that he and Tolces (but *not* Martin) were later forced by Gaines to accompany Gaines to Vereen's apartment.

apprehensive and returned to his own apartment, but Tolces decided he would stay to talk with Vereen to assure her he had not taken anything. While Tolces was still at the bottom of the stairs, Gaines arrived and they walked up together and entered Vereen's apartment.[9] Tolces recalled that Martin was already inside the apartment when he and Gaines walked inside. Lavender arrived soon after.[10]

After some discussion, Gaines obtained a gun and then took Tolces to look for Bowser. They went to an apartment occupied by "Renn," Bowser's ex-boyfriend, who told them Bowser might be at a nearby apartment. Tolces and Gaines went to that apartment and Gaines knocked or kicked the door open, brandished his gun, and took Bowser from the apartment. They then returned to, and left Bowser at, Vereen's apartment.[11] Gaines then took Tolces with him to get Hughes. Tolces attracted

---

[9]    Tolces acknowledged he had told police during an interview that Gaines and Lavender had taken him to Vereen's apartment at gunpoint, but claimed his memory at trial was better than it was at the time of the interview.

[10]    Martin's recollection was that she arrived at Vereen's apartment with Hughes, and Tolces was already there when she arrived. Tolces believed both Martin and Bowser had stayed at Vereen's apartment and were already there.

[11]    Precisely how Bowser arrived at Vereen's apartment was also a matter of some disagreement among the prosecution's witnesses. According to Tolces, *he and Gaines* met Bowser and then went to get Hughes. However, according to Hughes, defendants were at Vereen's apartment with Vereen, Hughes, and others. At some point during the night, defendants directed *Vereen and Hughes* to go get Bowser. Vereen and Hughes went to a couple of places before finding Bowser and taking her back to Vereen's apartment, where defendants were waiting. When Hughes was asked to explain one discrepancy between his trial testimony (that he went to get Bowser during the night) and the statements he had earlier given to police (that he had gone to collect Bowser around 2:00 p.m.), he responded "I don't know. Something just is not right right now. . . . [¶] . . . [¶] . . . Something is a blur right now. [¶] . . . [¶] . . . I know what I know. I do. I

Hughes's attention by tossing a small rock against a window of Hughes's apartment. When Hughes looked out, he saw Gaines holding a gun and heard Gaines order him to come downstairs. Gaines threatened to kill him and his (Hughes's) mother if he did not comply. Hughes came outside but was reluctant to go with them. Tolces was able to persuade Hughes to accompany them, and they got into a black car driven by Gaines.[12]

On the drive back to Vereen's apartment, Hughes and Tolces asked Gaines what was going on, but Gaines told them to "shut the fuck up" or he would "hit [them] with his gun," and periodically told them they were "going to get what [they] had coming [to them]." Gaines also said Tolces was "going to die tonight," and would be digging his own grave.

As soon as they arrived at Vereen's apartment, Gaines pushed Hughes inside where Vereen began hitting, punching and kicking him. Gaines and Vereen then stood Hughes up and escorted him and Tolces into a back bedroom. Eventually, all four targets

---

just got my story mixed up. That's all it is." Vereen, for her part, *denied* that Hughes's story of Vereen's involvement in getting Bowser was true. In contrast to Hughes's testimony, Martin testified she arrived at Vereen's apartment with Hughes and that *Bowser was already there* when Martin arrived.

12    Hughes agreed with Tolces that Gaines came to Hughes's apartment to get him, but testified (contrary to Tolces) that Tolces was *with* Hughes in the apartment when Gaines arrived, and that Gaines forced both of them to accompany him back to Vereen's apartment. Hughes's trial testimony—that Gaines came and got Hughes and Tolces from Hughes's apartment—also diverged from his own statement to police investigators that Gaines *and another man* came to Hughes's apartment to get Hughes and Tolces.

of defendants' inquisition (Hughes, Martin, Tolces and Bowser) were taken to the back bedroom with Lavender, Gaines and Vereen, and the physical abuse began in earnest.[13]

Vereen slapped Hughes, grabbed him by the ears and shook him, trying to force him to reveal the location of the checks. While in the back bedroom, Gaines and Lavender heated up spoons, knives and forks with a lighter, and used these heated instruments to burn Bowser's breasts, and also burned Martin's forehead. They also stuck the tines of the fork into Bowser's legs. Both Martin and Bowser were screaming.

Martin also testified that, after the girls were burned with the heated utensils, Lavender took them into a bathroom and handcuffed them over the shower rod. Lavender then used a pair of scissors to cut Martin's shirt from the bottom up, cutting through her bra and exposing her breasts. Lavender did the same thing to Bowser, and also pulled down Bowser's pants. While rubbing the scissors against them, Lavender told them that if they did not reveal the location of the checks, he was "going to put the

_____

[13]     The description of this segment of the events also differed among Hughes, Martin and Tolces. Hughes testified that, after he and Vereen brought Bowser back to Vereen's apartment, all four went into the back bedroom where the initial questioning and abuse occurred. Martin agreed with Hughes that all four victims spent some time in the bedroom together when Gaines and Lavender commenced questioning and torturing them. Martin testified it was only later that Gaines and Lavender separated the girls (Martin and Bowser) from the boys (Hughes and Tolces). However, Tolces testified he and Gaines (not Vereen and Hughes) retrieved Bowser and returned with her to Vereen's apartment, he and Hughes were *immediately* separated from Bowser and Martin on arriving at the apartment, and that he and Hughes remained in the living room the entire time. Vereen recalled that Lavender took the girls (Bowser and Martin) into the back bedroom to question them about the checks while Gaines questioned the boys (Tolces and Hughes) in the living room.

10

scissors up [them]."  At some point, either Gaines or Lavender also threatened that they would take the girls out to the desert and "make [them] dig [their] own hole."

Gaines was also busy trying to extract the information from the boys in the living room.  At one point, Gaines threw a knife at Tolces.  Gaines also struck Hughes in the face or forehead with his gun.  At some point during the ordeal, which Hughes estimated lasted from 8:00 or 9:00 p.m. until 6:00 a.m., Gaines also grabbed a hammer and chisel and threatened to hit Hughes if he did not reveal the location of the checks.  He then forced Hughes to the floor and began to tap the end of the chisel on Hughes's ear.  Gaines then used the hammer to pound the flat end of some nails against Hughes's head.  By this time, the girls had been brought back into the living room and were handcuffed together. Bowser had no clothes on and Martin was wearing only the shirt and bra that had been cut open.  As Gaines was about to again use the hammer and nail on Hughes, Bowser blurted out that she had taken the checks and said she had given them to a friend of Tolces.

Gaines, Lavender and Vereen began punching and slapping Bowser, and told her she was going to die.  Bowser was screaming for her life.  Next, either Gaines or Lavender began to shave Bowser's head with some clippers, which were pulling her hair out and causing her to bleed.  They then forced Tolces to take over shaving her head.  He

11

shaved a sizeable amount of hair from her head before he stopped, and her skin was ripped at the hairline.[14]

Around daybreak, Gaines and Lavender wrapped something around the still sobbing Bowser and led her in handcuffs from the apartment. This was the last time any of the witnesses saw Bowser.[15] However, when Vereen encountered Gaines the next morning, Gaines (referring to Bowser) told Vereen that the "girl is in a canal with a bag over her head barely breathing." Vereen did not take the remark seriously and thought Bowser had simply run away.

It appears neither Vereen nor any of the others elected to make any contemporaneous reports to police of the abuse or the abduction. During this all-night series of events, there was no evidence any neighboring apartment dweller complained or reported anything unusual.

*Discovery of the Body*

Around 3:00 a.m. on August 20, 2003, Bowser's lifeless body was discovered in an irrigation ditch in Imperial County. However, her body was not identified until February 2006.

---

[14] Martin told police investigators that Hughes was forced to shave some of Bowser's hair, and that *Vereen* then shaved off the remainder.

[15] Although Vereen testified she did not see Bowser again, she told police during an interview that she had last seen Bowser walking her bike in the company of Hughes and Tolces.

12

The autopsy by Dr. Garber was performed the day after discovery of Bowser's body. He believed the body had been in the ditch no more than one or two days before it was discovered. He concluded, based on the condition of the body, that she had been alive when she was placed in the water, had struggled while being held, and had died of drowning. However, he found no pathognomic evidence of drowning, i.e. no indicators that permitted him to say absolutely that drowning was the cause of death. For example, he did not find water or foam or frothy liquids in any of the airways, but he attributed the absence of these materials to the level of decomposition of the body. His opinion as to the cause of death was premised on the fact that she (1) was found in a body of water, (2) had emergent wrinkling or changes on her hands and feet, and (3) had a hemorrhage in her middle ears. However, he agreed the hemorrhage in her middle ears did not preclude other causes of death.

Dr. Garber characterized drowning as "a diagnosis of exclusion," which means the pathologist rules out other causes of death (such as strangulation or natural causes) before concluding drowning is the actual cause of death. One of the exclusions was whether intoxication played a role in the death, and he testified he awaited the results of toxicology tests before reaching his conclusion that drowning was the cause of death. He acknowledged a toxicology report showed some levels of gamma hydroxybutyric acid (GHB, a so-called "date rape" drug), but he stated that GHB is normally present in the body and was at normal postmortem levels. He excluded drug overdose as the cause of death based on the toxicology reports and his discussions with the toxicologist.

13

He could not determine whether the body exhibited any burns or abrasions because of the level of decomposition of the body, but there was bruising present. The photographs of the body showed no signs any of Bowser's hair had been shaved, and the autopsy report contained no mention that Dr. Garber observed any shaving of Bowser's hair.

B. The Defense Case

The parties stipulated that Hughes, Tolces and Martin were all released from Juvenile Hall between August 2, 2003, and August 14, 2003. Another actor in defendants' scenario, Joshua Thibideaux, was incarcerated in Juvenile Hall during the same time frame. On October 23, 2007, over a year and one-half after police identified the body as Bowser, Thibideaux gave a statement to police that was read to the jury. Although he was released on the same day that Bowser's body was found, Thibideaux's statement to police claimed he was at the apartment during the inquisition and torture of his fellow Juvenile Hall inmates. He prefaced his story by saying, "you gotta understand like small details like what we were doing and stuff I don't really remember but I remember huge things," but then related a description of events that tracked many of the salient aspects of the story conveyed by those fellow Juvenile Hall inmates. Specifically, he described the triggering events—that Hughes, Tolces and Bowser[16] planned to and

16   Thibideaux told police he did not know Bowser well but saw her occasionally before she disappeared. He agreed with the police detective that, prior to the night in question, "everybody was doing [Bowser]" and "were passing her around," although he never had sex with her.

14

did steal the checks belonging to defendants—and that when the theft was discovered, Hughes, Tolces, Bowser and Thibideaux went to Vereen's apartment where defendants were waiting; when the group arrived, defendants struck Hughes and tortured Bowser with heated implements to get the checks back. When the detective asked if another victim had been present, Thibideaux agreed a "Mary" was present, but initially denied any recollection that Martin was present because she was Thibideaux's "ex-girlfriend [and] I'm pretty sure I'd know if she was in there." However, when police told Thibideaux that Martin claimed to have been one of the victims, Thibideaux eventually agreed Martin was there because "[i]f she said she was there, she probably has a better memory than I do." Thibideaux went on to describe defendants tying up Martin and Bowser and torturing the naked girls, and defendants' pistol whipping and use of a hammer to torture Hughes. However, the following day, police confronted Thibideaux with the impossibility of his being present at Vereen's apartment because Thibideaux's incarceration at Juvenile Hall did not end until hours after Bowser's body had already been found.

The body, found in Imperial County, was finally identified as Bowser in February 2006. By that time, Hughes had moved from Palm Desert (located in Riverside County where all the events had transpired) and was living in Michigan. Ms. Fowler (an investigator with Imperial County) called Hughes at his new home and identified herself as an investigator with Imperial County, but did not otherwise state the reason she was calling. Although Hughes had no apparent connection to Imperial County and was not

15

told the reason for her call, he nevertheless immediately responded, "I'm glad you called. I've been wanting to tell somebody about this."[17]

The defense forensic pathologist, Dr Bonnell, reviewed numerous documents on which he relied for his opinions.[18] He would not have concluded Bowser's death was due to drowning because there was no "foamy edema" (water in the lungs) or water in the stomach, and the factors on which Dr. Garber relied (skin wrinkling and middle ear hemorrhaging) are present any time a body is immersed in water for a sufficient length of time, even if that immersion is postmortem. He also reviewed the autopsy and other photographs and found no evidence Bowser had been stabbed with a fork, or had any burn marks, or that any hair had been shaved from her head.

Dr. Bonnell agreed with Dr. Garber that drowning was a diagnosis of exclusion, requiring the pathologist to rule out other causes (such as preexisting conditions or drugs) that might explain the death. Dr. Bonnell explained that, because he could not rule out toxicology as the cause of death, he could not conclude drowning was the actual cause of Bowser's death. He explained that toxicology reports showed an elevated level of GHB in Bowser's vitreous fluids of 54.4 milligrams per liter. That amount was well above the 1 milligram per liter considered a normal therapeutic level, and studies had shown that

[17] Fowler had talked to a Mr. Loomis before she contacted Hughes, and Loomis was a friend of Hughes, but there was no evidence Loomis had talked to Hughes about Fowler's call.

[18] He reviewed Sheriff's investigative reports, the autopsy report, the coroner's memo, the toxicology results, photographs of the scene and the autopsy, the testimony of Dr. Garber, and interview transcripts from various individuals.

16

anything above 7 milligrams per liter is attributable to administered GHB rather than the amount of GHB produced by the body after death. Accordingly, Dr. Bonnell concluded Bowser had ingested GHB sometime before her death. Dr. Bonnell also noted that GHB is a respiratory depressant, and any levels above 50 milligrams per liter in the blood is normally considered toxic and anything above 700 milligrams is lethal in and of itself.

Dr. Bonnell stated he could not determine the amount of GHB Bowser had ingested because the body metabolizes GHB and therefore the residual levels decrease over time. An excessive dose can render the user unconscious, and he concluded there was a strong possibility Bowser overdosed on GHB but could not prove it.

Dr. Bonnell also testified Bowser had been dead between six and 12 hours before her body was discovered, and that her body had been in the water for only about an hour when it was discovered. This opinion was based in part on a witness's account of how the body was discovered,[19] and in part because there was no sunburn or severe decomposition that would suggest the body had been exposed to the extreme summer heat and sun associated with the desert in the summer. He believed Bowser was already dead when placed into the water because the scrape on her left upper chest showed no "vital reaction" and therefore was a postmortem scrape.

C. Rebuttal and Surrebuttal

The rebuttal and surrebuttal presentations were limited to scientific witness testimony. The prosecution witness, Mr. Anderson, is a toxicologist experienced with

_____

[19]   Dr. Bonnell relied on a witness who stated the body was not there around midnight but was there when the witness returned around 3:00 a.m.

17

GHB. He testified that GHB levels of 54 milligrams per liter is insufficient to be the sole cause of death, and when levels are that low, "you better look for another contributing cause of death." He conceded the test results strongly suggested Bowser had consumed GHB, but it was not a "substantial" ingestion. However, he agreed GHB has a very short half-life of between 20 and 60 minutes, so Bowser's GHB levels could have been twice that level just 20 to 30 minutes before her death. He agreed there were studies that attributed death to levels below 54, but he disagreed with those conclusions and stated the data had been misinterpreted.

Dr. Bonnell, testifying in surrebuttal, reaffirmed that any GHB levels above 7 show the decedent ingested GHB, and studies have indicated a minimum level to be 55 or 60 milligrams, while some studies have suggested toxicity can begin as low as 20, and the variation was likely attributable to the different body masses and metabolation rates of the subjects. He also noted that, because the half-life of GHB can be as fast as 18 minutes, a reading of 54 at the time of Bowser's death could mean her GHB levels were over 400 a little over an hour before her death if Bowser was a "fast metabolizer," and her body would have continued to metabolize the GHB even if she had lapsed into a coma.

II

ANALYSIS

A. The Jury Misconduct Claim

Defendants contend the trial court erred when it denied their motion for a new trial based on jury misconduct because it erroneously restricted the evidence presented in support of the motion, failed to conduct a *Hedgecock* hearing to resolve the disputed

18

issue of whether the jury's misconduct was substantial rather than fleeting, and concluded the presumption of prejudice had been sufficiently rebutted.

1. *The Motions*

Gaines filed a motion for new trial, in which Lavender joined, alleging jury misconduct. They argued the jury improperly discussed and considered during their deliberations defendants' failure to testify, which discussion was likely encouraged by the *Griffin*[20] error committed by the prosecutor during her rebuttal closing argument. Defendants supported the motion with declarations from three jurors. Juror No. 10 averred that, "There was no testimony from the defendants and we discussed this fact during the deliberations and openly talked about why they did not testify and that this fact made them appear guilty to us. [¶] There was not enough testimony from defendants' witnesses. The jury discussed that the defendants should have provided more witnesses, including themselves, to testify on their behalf." Declarations from two other jurors confirmed there were discussions concerning defendants' failure to testify: Juror No. 9's declaration (as filed by defendants in support of the motion for new trial) stated "[s]everal jurors . . . discussed the fact that the Defendants did not testify in this case"; and Juror No. 4's declaration (as filed by defendants in support of the motion for new trial) stated "the fact that the defendants did not testify was discussed *at length* during the deliberations and also *played a large part* in our decision. We discussed the fact that if the [defendants] were innocent then they should've testified." (Italics added.)

---

20      *Griffin v. California* (1965) 380 U.S. 609.

19

The prosecution filed opposition to the motion, including two declarations from two of defendants' declarants (the "clarifying" declarations),[21] and a declaration from the foreperson averring there was a single reference to their failure to testify and that it was immediately quashed by his admonishment.[22]

---

[21] As discussed above, Juror No. 9's declaration in *support* of the motion for new trial stated "[s]everal jurors . . . discussed the fact that the Defendants did not testify in this case." However, the prosecution's opposition to the motion for new trial included a "clarifying" declaration from Juror No. 9 stating only one juror mentioned the failure to testify, and the foreman admonished that they could not consider that issue, and the "several jurors" mentioned in her original declaration referred to several jurors verbally agreeing with that admonishment. As also discussed above, Juror No. 4's declaration in *support* of the motion for new trial stated "the fact that the defendants did not testify was discussed *at length* during the deliberations and also *played a large part* in our decision. We discussed the fact that if the [defendants] were innocent then they should've testified." (Italics added.) However, in the "clarifying" declaration filed by the prosecution in opposition to the motion for new trial, Juror No. 4 said only one juror mentioned the failure to testify, the foreman admonished that they could not consider that issue, and that was the end of the discussion. Juror No. 4's "clarifying" declaration left unexplained why his previous description (e.g. that it was an "at length" discussion that played a "large part" in the decision) was inaccurate.

[22] In their brief filed after our Supreme Court returned this matter to us with directions to reconsider this matter in light of *Bryant, supra*, 191 Cal.App.4th 1457, the People seem to assert the foregoing evidentiary showing from both sides was fatally flawed. They argue one of the declarations submitted by the defense in support of the motion contained only the month and year (but did not specify the actual date) it was signed, which rendered the declaration a nullity because of noncompliance with Code of Civil Procedure section 2015.5. Additionally, the People note none of the declarations submitted by the prosecution stated either the place of execution or that they were made "under the laws of the State of California," which rendered the prosecution's declarations inadmissible because of noncompliance with Code of Civil Procedure section 2015.5. Citing *Bryant's* holding that these technical defects produced an evidentiary vacuum, because "it is not permissible to treat unsworn statements of [the] jurors as though they had been made under penalty of perjury in order to attack a jury verdict for misconduct" (*Bryant, supra*, 191 Cal.App.4th at p. 1470), the People argue the proper disposition is to "return the matter to the trial court for a full and complete hearing with competent evidence." (*Id*. at p. 1471.) However, it is black letter law in California that, when

In reply, Gaines filed a declaration from the investigator who interviewed the jurors to obtain their original declarations, and provided proposed testimony to buttress the extent of the jury's discussions about defendants' failure to testify, and to undermine the clarifying declarations of Juror Nos. 4 and 9 filed by the prosecution. The

declarations are filed under Code of Civil Procedure section 2015.5 and there is no timely objection at trial that the declarations did not comply with the technical requirements of Code of Civil Procedure section 2015.5, a party may not complain on appeal of their admission into evidence. (*Robinson v. Grossman* (1997) 57 Cal.App.4th 634, 648-649; *Rader v. Thrasher* (1972) 22 Cal.App.3d 883, 889; *Fuller v. Goodyear Tire & Rubber Co.* (1970) 7 Cal.App.3d 690, 693; *People v. United Bonding Ins. Co.* (1966) 240 Cal.App.2d 895, 896, fn. 2.) Here, the People do not dispute that two of the defense declarations (from Juror Nos. 9 & 10) were letter perfect. The only defect in the final defense declaration (from Juror No. 4) was it identified the month and year but not the actual day it was signed, but this is precisely the kind of curable defect that is waived where, as here, the opposing party fails to object at trial. (See, e.g., *United Bonding,* at p. 896, fn. 2 [declaration was not dated in violation of Code of Civil Procedure section 2015.5 but "no objection on that ground was made in the trial court and (70 days still remaining within which to move to vacate the forfeiture) it could easily have been cured. We deem the point waived."].) Although *Bryant* seems to hold that objections to the form of juror declarations are unwaivable, we believe *Bryant's* ipse dixit holding, reached with no explanation or analysis and without any discussion of well-established law undermining its conclusion (see *Bryant,* at p. 1470), should not be perpetuated, and at least one other court has rejected this aspect of *Bryant.* (See *People v. Engstrom* (2011) 201 CalApp.4th 174, 184 & fn. 10 ["Although the declaration was hearsay, the People did not make a hearsay objection, forfeiting the contention on appeal" and declining to follow *Bryant*].) Accordingly, we treat as admissible the declarations filed by the parties.

Importantly, we also apprehend that strict adherence to *Bryant* would be a Pyrrhic victory for the People: the logical conclusion of excluding *all* declarations that did not strictly comply with Code of Civil Procedure section 2015.5 would produce an evidentiary landscape in which the defense evidence of misconduct—from Juror Nos. 9 and 10 (which the People do not suggest failed to comply with Code Civ. Proc. § 2015.5)—was *unrebutted by any evidence from the prosecution* because the People concede *none* of the prosecution's counter-declarations complied with Code of Civil Procedure section 2015.5, and *Bryant* warned "[n]or may the prosecution rely on an unsworn statement from a juror to refute affidavits properly submitted by the defendant in support of a motion for new trial based on jury misconduct." (*Bryant, supra*, 191 Cal.App.4th at p. 1469.) However, because the defense below did not object, we have included the prosecution's evidence in our analysis.

investigator stated he read Juror No. 4's clarifying declaration and averred "[t]his is . . . not what he told me . . . . [Juror No. 4] told me that the defendants not testifying was discussed *for some period of time and was more than a mere mentioning of that fact*. He also told me that the jury discussed that if they were really innocent they would have testified. He never said that [the foreperson] or any other juror admonished them to stop talking about that or that they could not consider this in their deliberations." (Italics added.) The investigator also stated that he read Juror No. 9's clarifying declaration and averred "[t]his is not what she told me when I first interviewed her. [Juror No. 9] told me that several jurors discussed the fact that the defendants did not testify. She did say that *at some later point in time* that a juror said that they should not discuss that. She never told me that the foreperson immediately put a stop to that discussion." (Italics added.) Finally, the investigator described his interview with another juror (M.G.), who told the investigator the jury discussed defendants' failure to testify and the adverse inference drawn from their silence.[23]

The trial court, recognizing the delicate and fine line separating admissible evidence of objective facts occurring in the jury room and inadmissible evidence of

---

[23] The investigator averred that M.G. told him the fact the defendants did not testify was "the main reason they found them guilty. [M.G.] said that the jury discussed this during their deliberations. [M.G.] said that the jury said during deliberations that if they were really innocent then they should have testified and told us they were innocent." However, the investigator explained that when he went back to M.G.'s house to obtain her signature on a declaration, M.G.'s husband told the investigator they would not file a declaration and if M.G. had known the investigator was assisting the defense, M.G. would not have spoken to him.

subjective reasoning processes of jurors (see, e.g., *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1116 (*Cissna*)), ruled on the defense evidence as follows:

> (1) Juror No. 9's statement in her original declaration that "[s]everal jurors also discussed the fact that the Defendants did not testify in this case" was admitted. The court excluded the balance of her original declaration as reflecting thought processes of the jury.
>
> (2) Juror No. 4's statement in his original declaration that "the fact that the defendants did not testify was discussed at length during the deliberations" was admitted. The court excluded his statements that these discussions "played a large part in our decision" and that "[w]e discussed the fact that if the defendants were innocent then they should've testified" as reflecting thought processes of the jury.
>
> (3) Juror No. 10's statement in his declaration that "[t]here was no testimony from the defendants and we discussed this fact during the deliberations" was admitted. The court excluded the balance of the declaration, including the statements that the jury "openly talked about why they did not testify and that this fact made them appear guilty to us" and the statement that "[t]he jurors discussed that the defendants should have provided more witnesses, including themselves, to testify on their behalf" as reflecting thought processes of the jury.
>
> (4) The court excluded the entirety of the investigator's declaration as hearsay, irrelevant, and a "violation of Evidence Code section [1150]."

The trial court, applying the same distinction between admissible evidence of objective facts and inadmissible evidence of the subjective reasoning processes of jurors, ruled on the prosecution evidence as follows:

> (1) Juror No. 9's statement in her clarifying declaration that "[t]he only discussion that occurred during deliberations regarding the defendants not testifying is when one of the jurors mentioned it. The foreperson immediately admonished that juror that we could not consider that issue. Several other jurors then also repeated that it was an issue that we could not consider" was admitted. The court

23

excluded the balance of her original declaration as reflecting thought processes of the jury, or as irrelevant or hearsay.

(2) Juror No. 4's statement in his clarifying declaration that "[t]he only discussion that occurred during deliberations regarding the defendants' not testifying is when a juror mentioned it. The foreperson immediately told the juror that we could not consider that issue" was admitted.

(3) Juror No. 12's statement that "[t]he only discussion that occurred during deliberations regarding the defendants not testifying is when one of the jurors mentioned it. I immediately admonished that juror that we could not consider that issue. I specifically recall that Juror No. 11 . . . also stated that we were not to consider that issue and must follow the instructions" was admitted. The court excluded the balance of Juror No. 12's declaration.[24]

On this record, the court found misconduct did occur. However, the court found the presumption of prejudice had been rebutted by the prosecution's showing that no actual prejudice occurred, because the foreperson's admonition cured the misconduct. The court also found there was insufficient basis for ordering a *Hedgecock* hearing, because there were no clearly defined and specific disputes on material issues relating to the misconduct, and a hearing would present a danger of inquiring into the thought processes of the jurors.

2. *Legal Principles*

A defendant has a constitutional right to a trial by an impartial jury. (*In re Hamilton* (1999) 20 Cal.4th 273, 293.) "An impartial jury is one in which no member has

---

[24]    When the prosecution asked whether Juror No. 12's statement, averring "[t]hat was the one and only reference to the defendants not testifying that occurred during deliberations," would be admitted, the court stated it would not admit it "because it will impact on whether there should be an evidentiary hearing."

been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it [citations]." ' " (*Id.* at p. 294.)

"Prejudicial jury misconduct constitutes grounds for a new trial." (*People v. Blackwell* (1987) 191 Cal.App.3d 925, 929.) In general, jurors commit misconduct when they directly violate the oaths, duties, and admonitions imposed on them. (*In re Hamilton, supra,* 20 Cal.4th at p. 294.)

It is well established that a jury commits misconduct when it violates a trial court's instruction not to discuss the defendant's failure to testify. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425 (*Leonard*).) "This misconduct gives rise to a presumption of prejudice, which 'may be rebutted . . . by a reviewing court's determination, upon [an examination of] the entire record, that there is no substantial likelihood that the [defendant] suffered actual harm.' " (*Ibid.*)

3. *Procedural Framework*

"When a defendant moves for a new trial based on jury misconduct, the trial court undertakes a three-part inquiry. 'First, the court must determine whether the evidence presented for its consideration is admissible. . . . [¶] Once the court finds the evidence is admissible, it must then consider whether the facts establish misconduct. . . . [¶] Finally, if misconduct is found to have occurred, the court must determine whether the misconduct was prejudicial.' " (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 475.)

This court recently explained that, when challenging the validity of a verdict based on juror misconduct, the first step requires a defendant to "present evidence of overt acts or statements that are objectively ascertainable by sight, hearing, or the other senses."

25

(*Cissna, supra,* 182 Cal.App.4th at p. 1116.) We also cautioned that "[n]o evidence may be presented concerning the subjective reasoning processes of a juror that can neither be corroborated nor disproved . . . ." (*Ibid.*) Thus, the first step requires the court to cull admissible evidence of overt conduct from inadmissible evidence purporting to describe the subjective reasoning processes of the juror or jury.

In the second step, the court must examine the admissible evidence assembled during the first step to determine whether misconduct occurred. Where the admissible evidence raises a strong possibility that misconduct has occurred, the trial court also has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by the claim of juror misconduct. (*People v. Avila* (2006) 38 Cal.4th 491, 604.) A defendant is not entitled to an evidentiary hearing "as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing . . . should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*Ibid.*)

If the court determines there was misconduct, it must then turn to the final step of determining prejudice. As to the last step, our Supreme Court has explained that "[m]isconduct by a juror . . . usually raises a rebuttable 'presumption' of prejudice. [Citations.] This presumption aids parties who are barred by statute from establishing the actual prejudicial effect of the incident under scrutiny [citations] and accommodates the

26

fact that the external circumstances of the incident are often themselves reliable indicators of underlying bias [citation]. [¶] Still, whether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice." (*In re Hamilton, supra,* 20 Cal.4th at pp. 295-296.)

Our Supreme Court in *In re Carpenter* (1995) 9 Cal.4th 634, after noting a verdict will be set aside if there appears to be a substantial likelihood of juror bias, expanded on the relevant inquiry by explaining that juror bias:

> "can appear in two different ways. First, we will find bias if the [improper conduct], judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test.
>
> "The first of these tests is analogous to the general standard for harmless-error analysis under California law. Under this standard, a finding of 'inherently' likely bias is required when, but only when, the [improper conduct] was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this 'inherent prejudice' test obviously depends upon a review of the trial record to determine the prejudicial effect of the [improper conduct].
>
> "But a finding that the [improper conduct] was 'harmless' by appellate standards, and thus not 'inherently' biasing, does not end the inquiry. *Ultimately, the test for determining whether juror misconduct likely resulted in actual bias is 'different from, and*

27

*indeed less tolerant than,' normal harmless error analysis, for if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict.* [Citation.] A biased adjudicator is one of the few 'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards.' [Citations.] *Thus, even if the [misconduct] was not so prejudicial, in and of itself, as to cause 'inherent' bias under the first test, the totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose.* Under this second, or 'circumstantial,' test, the trial record is not a dispositive consideration, but neither is it irrelevant. All pertinent portions of the entire record, including the trial record, must be considered. 'The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual harm.' " (*In re Carpenter, supra,* 9 Cal.4th at pp. 653-654, first and second italics added.)

Whether prejudice arose from juror misconduct is a mixed question of law and fact. "On appeal from a ruling denying a new trial motion based on juror misconduct, we defer to the trial court's factual findings if supported by substantial evidence, and exercise our independent judgment on the issue of whether prejudice arose from the misconduct . . . ." (*Cissna, supra,* 182 Cal.App.4th at p. 1117; see also *People v. Nesler* (1997) 16 Cal.4th 561, 582 ["Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination."]; *People v. Danks* (2004) 32 Cal.4th 269, 303-304.)[25]

---

25   As part of our compliance with the Supreme Court's direction to reconsider the cause in light of *Bryant, supra,* 191 Cal.App.4th 1457, *Von Villas, supra,* 11 Cal.App.4th 175, and *Perez, supra,* 4 Cal.App.4th 893, we conclude those cases are additionally inconsistent with controlling Supreme Court authority on the appropriate standard of review. In *Perez,* the court accurately stated the three-step process for a trial court to

4. *Analysis of First Step*

As a preliminary matter, we conclude the court erred when it excluded, and therefore did not weigh, certain evidence relevant to showing the scope of the misconduct. Although the court admitted Juror No. 4's statement (in his original declaration) that "the fact that the defendants did not testify was discussed at length during the deliberations," it excluded his statements that these discussions "played a large part in our decision" and that "[w]e discussed the fact that if the [defendants] were innocent then they should've testified." The latter statement clearly represented "statements that are objectively ascertainable by sight, hearing, or the other senses" (*Cissna, supra,* 182 Cal.App.4th at p. 1116), and should have been admitted. The former statement, while arguably describing the "subjective reasoning processes" of the jury, is at least equally capable of an interpretation that described the *quantitative* level at which

evaluate a motion for new trial based on jury misconduct, but then stated "[a] trial court has broad discretion in ruling on *each* of these questions and its rulings will not be disturbed absent a clear abuse of discretion." (*Perez,* at p. 906, italics added.) *Bryant* cited *Perez* with approval for this standard of review (*Bryant,* at p. 1467), and *Von Villas* likewise stated a "trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion." (*Von Villas,* at p. 255.) In *People v Ault* (2004) 33 Cal.4th 1250, our Supreme Court extensively discussed the proper standard of review for new trial rulings. Although recognizing the historical maxim that such rulings are "disturbed only for clear abuse of . . . discretion" (*id.* at p. 1260), the court noted a contrary trend in a "series of decisions" that reserve the deferential standard to orders *granting* new trials. (*Ibid.*) In contrast, for orders *denying* a new trial, as was the case in *Perez, Von Villas* and *Bryant,* the cases appear to apply the independent review standard as the appropriate approach, partly because denials of new trial motions can cut off, with finality, "a party's rights, either as to the entire case, or on a significant issue in the litigation." (*Ault,* at p. 1266.)

29

the failure to testify was involved in the jury's discussions,[26] and therefore was admissible as objectively ascertainable conduct.

Although the court admitted Juror No. 10's statement that "[t]here was no testimony from the defendants and we discussed this fact during the deliberations," it excluded the balance of the declaration. While most of the balance of Juror No. 10's statement was inadmissible, the court excluded two statements (e.g. that the jury "openly talked about why they did not testify and that this fact made them appear guilty to us" and that "[t]he jurors discussed that the defendants should have provided more witnesses, including themselves, to testify on their behalf")[27] that clearly represented "statements that are objectively ascertainable by sight, hearing, or the other senses" (*Cissna, supra*, 182 Cal.App.4th at p. 1116), and should have been admitted.

---

[26]    Indeed, the *context* of the phrase lends additional weight to our interpretation that the phrase "played a large part in our decision" conveyed the quantitative level of the jury's discussions concerning defendants' failure to testify. Juror No. 4 stated "the fact that the defendants did not testify was discussed at length during the deliberations and also played a large part in our decision," suggesting his description of the "large part" was connected to his description of the "discussed at length" part of his declaration.

[27]    Juror No. 10's statement that the jury discussed that "the defendants should have provided more witnesses, including themselves, to testify," may have been prompted by a statement made by the prosecutor during rebuttal closing argument. The prosecutor, responding to the defense argument that the prosecution had no testimony from defendants' employers or coworkers that defendants had not shown up for work on the day Bowser went missing, stated "[w]ell, guess what, if they had an alibi, there's nothing stopping them from presenting it." Defendants' failure to provide an alibi, either by testifying or calling others, may have been the "more witnesses, including themselves" the jury discussed when evaluating their guilt.

Finally, the court entirely excluded the investigator's declaration, concluding it was hearsay.[28]  Certainly, *unsworn* hearsay is incompetent to prove misconduct (*People v. Dykes* (2009) 46 Cal.4th 731, 810-811), but the investigator's declaration was submitted under penalty of perjury, and therefore is distinct from the information considered in *Dykes*.  We agree the investigator's averments as to what he was told by juror M.G. was inadmissible hearsay, because it was offered for the truth of the matters asserted, i.e. that the jury discussed defendants' failure to testify during their deliberations and "the jury said during deliberations that if they were really innocent then they should have testified and told us they were innocent."  However, the investigator's testimony, offered to impeach the clarifying declarations submitted by Juror Nos. 4 and 9, was not inadmissible hearsay because it was offered as prior inconsistent statements by those jurors, which at a minimum made the statements admissible under Evidence Code section 1202.[29]  (Cf. *People v. Williams* (1976) 16 Cal.3d 663, 668.)

---

[28]    The court also excluded the declaration as irrelevant and because it comprised an unspecified violation of Evidence Code section 1150.  The People on appeal do not seek to justify exclusion under either of those grounds, and we do not further consider those bases.

[29]    The investigator said he read Juror No. 4's declaration and stated "this is . . . not what [Juror No. 4] told me.  [Juror No. 4] told me that the defendants not testifying *was discussed for some period of time and was more than a mere mentioning of that fact*.  He also told me that the jury discussed that if they were really innocent they would have testified.  He never said that [the foreperson] or any other juror admonished them to stop talking about that or that they could not consider this in their deliberations."  The investigator also stated that he read the clarifying declaration submitted by Juror No. 9, and "[t]his is not what she told me when I first interviewed her.  [Juror No. 9] told me that several jurors discussed the fact that the defendants did not testify.  She did say that at some later point in time that a juror said that they should not discuss that.  She never

31

5. *Analysis of Second Step*

The state of the admissible evidence before the trial court showed the jury, in violation of the court's instructions and the defendants' rights, discussed the defendants' failure to testify and the adverse inference to be drawn from that fact. The trial court found, and the People acknowledged in their original brief on appeal, "[b]y discussing the fact that [defendants] had not testified, [the] jurors committed misconduct." Indeed, the People also conceded in their original brief on appeal " ' "[t]his misconduct gives rise to a presumption of prejudice, which 'may be rebutted' " ' " (quoting *People v. Loker* (2008) 44 Cal.4th 691, 749 (*Loker*)). Because the People's concessions appear consonant with applicable law (see *Leonard, supra*, 40 Cal.4th at p. 1425), we accept these concessions and therefore turn to the issue of whether the presumption of prejudice has been rebutted. (*Ibid.*; accord, *People v. Hord* (1993) 15 Cal.App.4th 711, 725 (*Hord*).)

6. *Analysis of Third Step*

Our independent review of the entire record convinces us the presumption of prejudice has not been rebutted because the evidence does not show there was no substantial likelihood defendants suffered actual harm as a result of the jury misconduct. We begin by noting there was no forensic evidence connecting defendants to Bowser's death *at all*, and even the forensic evidence and opinions concerning the *cause* of her

---

told me that the foreperson immediately put a stop to the discussion." Moreover, to the extent that the declarations submitted by the prosecution made Juror Nos. 4 and 9 "witness[es] . . . at the hearing" on the issue of jury misconduct within the meaning of Evidence Code section 1235, their prior inconsistent statements would also be admissible under Evidence Code section 1201 for the truth of the statements contained in the declarations. (Evid. Code, §§ 1201 & 1235.)

death were sharply conflicting and approaching equipoise. Because of this dearth of forensic certainties, the jury was required to assess defendants' guilt or innocence by deciding whether it believed the prosecution's version of what transpired, or whether it instead gave sufficient credit to the defense theory of what happened to raise a reasonable doubt as to the prosecution's version.

The prosecution's version rested entirely on the testimonies of the prosecution's four witnesses whose testimonies (at best) were inconsistent in numerous details among the four witnesses' versions and (at worst) were inconsistent with the forensic evidence.[30] In this milieu, the jury expressly discussed to some degree (and according to one juror's declaration discussed to an extensive degree) that its credibility calculus would be influenced by defendants' failure to testify in their own defense. In *Cissna, supra*, 182 Cal.App.4th 1105, this court considered an analogous claim of misconduct. In *Cissna*, a juror extensively discussed the case with an outsider, and one of the topics of their conversations was "the implications to be drawn from the fact defendant would not likely be testifying . . . ." (*Id*. at p. 1119.) This court, noting the nature of the case

---

[30] Martin and Hughes testified defendants repeatedly burned Bowser. The prosecution's expert could *not* determine whether the body exhibited any burns, which he attributed to the level of decomposition of the body, even though the body was found less than 24 hours after Bowser disappeared and was in the water less than eight hours. In contrast, the defense pathologist affirmatively stated there was *no evidence* of burn marks. The prosecution witnesses also said Bowser's head had been partly (or fully) shaved, and there was *no* evidence the body was missing any hair. One witness also told police that defendants had stabbed Bowser's leg with a fork; again, there was *no* forensic evidence of any stab wounds. Finally, Vereen testified Gaines told her that the "girl is in a canal with a bag over her head barely breathing." There was no evidence there was any bag found on or near Bowser's body.

(charges of continuous sexual molestation against a victim under the age of 14) made the credibility of the prosecution's witness of pivotal importance, observed:

> "[T]he fact that Juror D. and G. discussed the import of defendant's decision not to testify demonstrates that this outside influence was directed to a critical issue and one that was potentially highly detrimental to the defense. As is true in all criminal trials, the jury was instructed that it is not permitted to consider or discuss the fact that defendant exercised his constitutional right not to testify. [Citation.] This rule is designed to prevent the jury from drawing adverse inferences against the defendant in violation of the constitutional right not to incriminate oneself. [Citation.] In some cases the courts have found comments about a defendant's failure to testify to be nonprejudicial misconduct. [Citing *Hord, supra,* 15 Cal.App.4th 711, *Leonard, supra,* 40 Cal.4th 1370 and *Loker, supra,* 44 Cal.4th 691.]

> "Unlike the situations in *Hord, Leonard* and *Loker*, the circumstances of this case show the discussion of defendant's decision not to testify carried a high potential of prejudice to the defense. In the absence of physical evidence, sexual molestation cases inevitably turn largely on the jury's evaluation of the victim's credibility. A defendant is entitled to have all 12 jurors make this evaluation without considering whether the defendant took the stand to deny the accusations. The defendant's silence should not be a factor adding to any inferences that the victim is telling the truth. The fact that Juror D. discussed defendant's silence with G. reflects that Juror D. considered this factor. . . . This improper influence obviated the defendant's constitutional right not to have his silence play any role in his conviction." (*Id.* at pp. 1120-1121, fns. omitted.)

Here, as in *Cissna*, there was no physical evidence remotely connecting defendants to Bowser. Accordingly, as in *Cissna*, the entire case here turned on the credibility of witnesses whose versions were at best internally inconsistent in many particulars. Under the facts of this case, we cannot conclude the jury's discussion of defendants' failure to testify, which "presumptively establish[ed] prejudicial jury misconduct" (*People v. Perez* (1992) 4 Cal.App.4th 893, 908-909), did not warrant a new

34

trial because we cannot conclude " '*upon examining the entire record,* that there is no substantial likelihood that [defendants] suffered actual harm [from the misconduct].' " (*In re Carpenter, supra,* 9 Cal.4th at p. 654.)

The People, relying on *Leonard* and *Loker*, argue the presumption of prejudice was rebutted because the jury foreman's declaration averred that there was a single comment about the defendants' failure to testify and that he immediately reminded the jury it could not consider their failure to testify. Even assuming the foreman's declaration was credited, the actions below differ markedly from the actions considered in *Leonard* and *Loker* and instead more closely resemble the conduct in *Cissna* and *Lopez.* For example, in *Leonard*, the offending conduct was limited to comments (made during the penalty phase deliberations) by jurors that they " 'would have liked for [defendant] to testify during the penalty phase so that we could better understand why he killed six people, and whether he was truly remorseful . . .' [and] understand the extent of his impairment.' " (*Leonard, supra*, 40 Cal.4th at p. 1424.) *Leonard*, concluding this was not prejudicial misconduct, reasoned:

> "[T]he purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to *prevent the jury from drawing adverse inferences* against the defendant, in violation of the constitutional right not to incriminate oneself. Here, the comments on defendant's failure to testify mentioned in defendant's new trial motion merely expressed regret that defendant had not testified, because such testimony might have assisted the jurors in understanding him better. In the words of the trial court: 'I think that wanting to hear defendants testify is natural. We do the best we can to deter jurors from speculating and from drawing negative inferences, but *merely referencing that they wish he would have testified is not the same as punishing the Defendant for not*

35

*testifying. It is not the same as drawing negative inferences from the absence of testimony.*' " (*Id.* at p. 1425.)

Similarly, in *Loker*, the defendant's failure to testify was " 'mentioned only briefly' " and only in the context of the penalty phase (*Loker, supra*, 44 Cal.4th at p. 748, fn. 27), and *Loker* (following *Leonard*) found any presumption of prejudice was rebutted because the offending conduct was brief and relatively innocuous. (*Loker,* at pp. 748-749.)

Here, in contrast, the evidence showed the discussions, in addition to being more extensive than in *Leonard* or *Loker*, involved a discussion of precisely the type of inference *not* present in *Leonard* or *Loker*: an inference of guilt based on their failure to testify. That distinction was recognized by the *Hord* court when it considered a claim of misconduct. The declarations from the jurors in *Hord* stated there was a "comment" or it was "discussed" that the defendant did not testify. (*Hord, supra*, 15 Cal.App.4th at pp. 721-722.) *Hord* stated:

> "Here, during deliberations there was a comment or comments made about defendant's not testifying and a comment regarding defendant's sentence. Although these matters were not to be discussed, the discussion was very different than when a juror performs experiments or brings in new law or facts into deliberations. The jury was obviously well aware here that defendant did not testify and equally aware that he would be punished if the jury found him to be guilty. Thus the comments did not interject any new material into deliberations that was not already known by the jury from the trial itself. Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion. . . ."
>
> "When comments go beyond natural curiosity and their content suggests inferences from forbidden areas, the chance of prejudice increases. For example, if a juror were to say, 'The defendant didn't

36

testify so he is guilty,' . . . the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits. Such comments are more likely to influence that juror and other jurors.

"In [the juror's] initial declaration, he recited a juror's oblique remark about a party not saying anything to protect himself. Although this comment may have carried a greater potential for prejudice than a mere statement of curiosity, in light of the record before us it does not require reversal. It does not appear that there was a lengthy discussion . . . . The comments did not involve extra record material but were regarding matters already obvious to the jurors. More importantly, the foreperson admonished his fellow jurors and reminded them they could not consider defendant's not testifying during deliberations." (*Hord, supra,* 15 Cal.App.4th at pp. 727-728.)

Here, unlike the situations in *Hord, Leonard* and *Loker*, the discussion about defendants' failure to testify was not limited to expressions of regret or curiosity, but instead was expressly linked to the adverse inference of guilt to be drawn from the failure to testify.[31] In *Hord's* words, when such comments arise in the jury room, "the chance of prejudice increases . . . [because] the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits. Such

---

[31] Although the foreman here told the jury not to consider the *fact* of the defendant's failure to testify, as occurred in *Loker* and *Hord* (*Loker, supra*, 44 Cal.4th at p. 748; *Hord, supra,* 15 Cal.App.4th at p. 728), neither *Loker* nor *Hord* involved a jury that *also* discussed the inference of guilt it would draw from that fact, and therefore neither case supports the notion that a jury foreman's admonition can *cure* the taint created by such discussions. Indeed, when a jury chooses to place that inference on the table *notwithstanding the court's express prior instruction* not to consider the same inference, we have difficulty understanding why the foreman's *repetition* of that instruction would have any curative effect on a jury that has already evinced a willingness to disregard the court's instructions.

37

comments are more likely to influence that juror and other jurors." (*Hord, supra,* 15 Cal.App.4th at p. 728.)

We conclude that, because the evidentiary landscape here was devoid of forensic certainties and therefore turned entirely on close and substantial credibility assessments of the veracity of prosecution witnesses whose testimony was at best in disarray, and a "defendant is entitled to have all 12 jurors make this [credibility] evaluation without considering whether the defendant took the stand to deny the accusations [and] [t]he defendant's silence should not be a factor adding to any inferences that the victim is telling the truth" (*Cissna, supra*, 182 Cal.App.4th at p. 1121), the presumption of prejudice from the misconduct has not been rebutted.

7. *The Question of Disposition*

In our original decision, we reversed the convictions and remanded the case for a new trial based on our conclusion that, on the showings made by the defense and prosecution during the original motion for new trial, there was admissible evidence upon which to evaluate whether misconduct had occurred (see part II.A.4, *ante*), the trial court correctly found (and the People on appeal conceded) misconduct had occurred (see part II.A.5, *ante*), and our independent review of the entire record convinced us the presumption of prejudice from the misconduct had not been rebutted (see part II.A.6, *ante*). Our original disposition followed well-established precedent. (See, e.g., *Cissna, supra*, 182 Cal.App.4th 1105; *People v. Castro* (1986) 184 Cal.App.3d 849 [juror misconduct]; *People v. Brown* (1976) 61 Cal.App.3d 476 [juror misconduct]; *In re Stankewitz* (1985) 40 Cal.3d 391 [juror misconduct]; *City of Los Angeles v. Decker*

(1977) 18 Cal.3d 860; *Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499 [juror misconduct]; *Smoketree-Lake Murray Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724 [juror misconduct]; *Clemens v. Regents of University of California* (1971) 20 Cal.App.3d 356 [juror misconduct].)

However, the People now argue for the first time (see fn. 3, *ante*) that we should not have reversed and ordered a new trial. Instead, relying on *Perez, Von Villas* and *Bryant*, the People argue we should have conditionally reversed the judgment and remanded the case to the trial court with directions to conduct a new evidentiary hearing under *Hedgecock* and then rehear the new trial motion based on the new evidentiary record. To determine whether we should follow *Perez, Von Villas* and *Bryant* on the facts of this case, we examine those cases.

In *Perez*, after the jury returned its verdict, the defense moved for funding to investigate possible jury misconduct, asserting defense counsel learned from a juror that several jurors mentioned the fact the defendant did not testify during deliberations. However, neither defense counsel nor any juror submitted a declaration or affidavit stating these or similar facts. When ruling on the motion for funding, the trial court made clear it would not deny the motion for technical deficiencies (the absence of a declaration), but stated it would deny the motion because it believed " 'this type of inquiry is of the sort that is precluded; that a juror may not impeach his or her own verdict on the theory that he or other jurors did not follow the law,' " and therefore no good cause for funding was shown. (*Perez, supra,* 4 Cal.App.4th at p. 905.) The trial court also assumed counsel was seeking a new trial, but when defense counsel balked at

39

making an oral motion without the competent evidence an investigation might produce, the trial court assumed " 'for the sake of argument that all 12 jurors would say that that discussion [regarding appellant's failure to testify at trial] took place,' " and when the defense then made a new trial motion on that presumed set of facts, the trial court denied that motion. (*Id*. at p. 906.) This court on appeal noted that it was reviewing the trial court ruling considering the premise on which the trial court denied the motion (that 12 jurors would have signed declarations saying they discussed Perez's failure to testify), and the principal analysis in and holding of *Perez* was that the trial court erred when it concluded those declarations would have been inadmissible. (*Id*. at pp. 906-909.) Moreover, *Perez* concluded that if the jurors had discussed this topic in disregard of the court's express instructions, the jury declarations "would have . . . constituted clear evidence of misconduct. While the court has broad discretion to rule on a new trial motion, that discretion was abused here, where the court denied the motion on a factual scenario presumptively establishing prejudicial jury misconduct." (*Id*. at pp. 908-909.)

We are in agreement with the portion of *Perez* that constituted its ratio decidendi: juror declarations stating the jury discussed the defendant's failure to testify are admissible, constitute "clear evidence of misconduct," and "presumptively [establish] prejudicial jury misconduct." However, *Perez* then went on to fashion the following dispositional order:

> "Our conclusion the court prejudicially erred in denying the new trial
> motion requires that we vacate the judgment and remand for further
> proceedings. On remand we wish to emphasize the trial court should
> not assume 12 jurors actually discussed Perez's failure to testify.
> Although we appreciate a substantial period of time has expired

40

since the jury in this case was discharged and obtaining declarations from some or all of the jurors may be difficult or impossible, we do not believe the court's earlier error relieving defense counsel of this burden should result in any other procedure than that required by law." (*Perez, supra,* 4 Cal.App.4th at p. 909.)

*Perez* cited nothing to support its conclusion that such remand was a "procedure . . . required by law." Indeed, absent some pertinent law that makes new trial motions based on jury misconduct *different* from other matters that trial courts must decide, we are unable to understand *why* a trial court would be precluded from ruling on a new trial motion based on jury misconduct established by presumed or stipulated facts, considering the numerous *other* proceedings in which such a procedure seems permissible. (See *Von Villas, supra,* 11 Cal.App.4th at pp. 263-264 (conc. & dis. opn. of Woods, J.) [rule that would preclude decision on a new trial motion based on jury misconduct premised on agreed-upon facts results in "creating out of whole cloth a new rule irreconcilable with stare decisis," citing numerous cases].)

Even assuming *Perez's* newly created dispositional remedy (that appears only to have been given currency by *Von Villas* and *Bryant*) was correct on its facts, we would not follow *Perez* because it is the factual antithesis of the present case. In *Perez,* the court ordered the new trial motion restarted anew because it doubted the court could assume the evidentiary predicate without proper declarations from jurors, and remanded to place the burden back on the defendant, which the court's error had relieved the defense of; here, in contrast, the defense has *already* met its burden because it *did* file declarations from jurors establishing the evidentiary predicate to the motion. We do not believe *Perez* can or should be extended to require the defense to reinvent the wheel,

41

particularly considering the lengthy passage of time that has elapsed since the original, properly supported motion was filed. (Cf. *People v. Snow* (1987) 44 Cal.3d 216, 226-227 [reversing and ordering new trial for error pursuant to *People v. Wheeler* (1992) 4 Cal.4th 284 and declining the People's suggestion to order limited remand to permit prosecutor to explain reasons for excluding prospective jurors because "it would be 'unrealistic to believe that the prosecutor could now recall in greater detail his reasons for the exercise of the peremptory challenges in issue, or that the trial judge could assess those reasons, as required, which would demand that he recall the circumstances of the case' "]; *People v. Williams* (2000) 78 Cal.App.4th 1118, 1125; *U.S. v. Washington* (9th Cir. 1987) 819 F.2d 221, 224 [claim of jury misconduct; court reversed rather than remanded for full hearing because "a remand to question jurors more than two years after trial is less certain to expose potential prejudice. Memories fade and biases change over time. In addition, the reliability of the jurors' responses as to whether they were acquainted with the government witnesses may be compromised by their verdict; at this late date a juror might understandably be embarrassed to admit knowing a witness when that knowledge, though not then acknowledged, has now become crucial. The guarantee of an impartial jury is far too central to our concept of a fair trial for determination of whether a defendant has been prejudiced by a partial or biased jury to be dependent upon the vagaries of such a procedure."].)[32]

---

[32]    The defendants also argue the remedy now urged by the People—to order a *Hedgecock* hearing and then to revisit the new trial motion after the hearing—should be foreclosed under principles of judicial estoppel, because the prosecution below

The second case we are directed to evaluate, *Von Villas*, relied exclusively on *Perez* for its dispositional order (see *Von Villas, supra,* 11 Cal.App.4th at pp. 258-259), and therefore contains the same infirmities we believe infect *Perez.* Moreover, *Von Villas* was decided in a factual context distinct from the facts here. In *Von Villas*, jurors were interviewed by a defense investigator, and a declaration was prepared by the defense for one of those jurors allegedly admitting misconduct, but the juror refused to sign it; indeed, the juror denied to defense counsel that she had told the investigator the facts contained in the declaration. (*Id.* at pp. 251-252.) However, the parties stipulated that the investigator would testify the juror had made the statements in the unsigned

---

successfully *opposed* the defense request for a *Hedgecock* hearing, and the People's brief in the original appeal argued the *Hedgecock* hearing was properly denied by the trial court below. (See fn. 3, *ante*.) In California, courts consider five factors in determining whether to apply judicial estoppel: "The doctrine [most appropriately] applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987.) Although a litigant seeking to invoke judicial estoppel typically is not required to make a showing of detriment (see *Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 1015-1016), considerations of detriment to the opposing party may inform the doctrine's application in specific factual contexts. (See *New Hampshire v. Maine* (2001) 532 U.S. 742, 751 [judicial estoppel may be more appropriate in cases involving "unfair detriment"].) Although it is unnecessary definitively to apply judicial estoppel here, the elements appear facially present in this case, and the fact that years have passed could well harm defendants by eroding the reliability of any evidence (whether from the fading of memories as to the precise dynamics of the deliberations, or the coloring of memories from posttrial publicity, or simply the inability to reassemble the entire jury to conduct the inquiry) that might be gleaned from ordering a *Hedgecock* hearing, as now proposed by the People.

43

declaration.[33]  The prosecution, relying on the fact that no admissible evidence of misconduct had been introduced, made no effort to rebut the allegations or to show lack of prejudice.  The trial court denied the motion for new trial, stating there was no evidence the alleged misconduct " 'effected [*sic*] the finding of their guilt.' "  (*Von Villas, supra,* 11 Cal.App.4th at p. 253.)  The *Von Villas* court, noting that "a series of errors on all sides . . . brought about an untenable situation for the trial judge who, in turn, committed error by applying an incorrect legal analysis of the jury misconduct issue" (*id.* at p. 257), held (relying on *Perez*) the appropriate remedy was to remand for a new hearing at which the trial court would examine the jurors to test their credibility and determine whether misconduct had occurred.  (*Von Villas, supra,* 11 Cal.App.4th at pp. 258-260.)

In his concurrence and dissent in *Von Villas*, Justice Woods—noting the majority opinion conceded the defendant had produced (by way of stipulation) evidence demonstrating misconduct and that misconduct gave rise to a presumption of prejudice unrebutted by the prosecution's showing (*Von Villas, supra,* 11 Cal.App.4th at pp. 262-263 (conc. & dis. opn. of Woods, J.))—expressed consternation that "[i]nstead of forthrightly reversing the Von Villas judgment and ordering a new *trial,* as the law requires, the majority shrinks from its duty and without authority or coherent explanation

---

[33]  In *Von Villas*, a second juror also allegedly told the investigator about a different act of misconduct, but the juror refused to testify at the new trial hearing.  The parties stipulated that the investigator's testimony regarding the second juror's admissions about the different act of misconduct would be admissible.  (*Von Villas, supra,* 11 Cal.App.4th at pp. 252-253.)

simply invokes the deus ex machina of ordering a new trial *hearing*. Conceding that Von Villas proved *once* that his trial was unfair, the majority opinion now—three years later—requires him to prove it again." (*Id* at pp. 261-262.) Justice Woods noted the evidentiary concerns of the majority were unwarranted, because the parties had stipulated to the testimony and numerous authorities supported the use of stipulated evidence to decide matters (*id*. at pp. 263-264), and concluded the majority approach would, if adopted, create a "new rule . . . that *only live testimony counts*. Otherwise there will be 'an untenable situation for the trial judge' [(maj. opn., *ante,* at p. 257)] [and] 'the trial judge must be allowed the opportunity to at least test the credibility of [the juror]' [(maj. opn., *ante,* at p. 258)]." (*Id.* at p. 263.)

We agree with Justice Woods that mandating a hearing at which live testimony from jurors is solicited whenever any potential evidentiary conflicts exist, and barring the use of other evidentiary submissions to resolve motions for new trials premised on jury misconduct, is contrary to established precedent.[34] Moreover, as with *Perez,* we would not follow *Von Villas* because of the factual differences to the present case. In

---

[34]     Indeed, if *Von Villas* is correct, the discretionary decision to hold a *Hedgecock* hearing will be severely constrained whenever there is *any* declaration from a juror alleging misconduct. *Von Villas* supported its rationale for ordering an evidentiary hearing by noting Justice Mosk's condemnation of " 'an incipient trend, that of losing parties attempting to impeach jury verdicts. We see this in numerous appeals and petitions for review based on juror affidavits. . . . [¶] 'In most cases it is not difficult for counsel to persuade a juror to sign a law-office-prepared affidavit.' [Quoting Justice Mosk's concurring opinion in *Ballard v. Uribe* (1986) 41 Cal.3d 564, 575].)" (*Von Villas, supra*, 11 Cal.App.4th at p. 258.) To the extent the *Von Villas* court requires a trial judge to "test the credibility of [jurors providing evidence of misconduct]" before ruling on a new trial motion (*ibid.*), we would expect a proliferation of *Hedgecock* hearings if *Von Villas* is followed.

45

*Von Villas*, the court ordered the new trial motion started anew because there was no competent evidence *from the jurors* attesting to misconduct; here, in contrast, the defense met its burden with properly attested declarations from jurors establishing the misconduct. We do not believe the defense, having "proved *once* that [the] trial was unfair, [should nearly] three years later [be] require[d] to prove it again." (*Von Villas, supra,* 11 Cal.App.4th at p. 261-262 (conc. & dis. opn. of Woods, J.).)

The final case we are directed to evaluate, *Bryant, supra*, 191 Cal.App.4th 1457, again relied exclusively on *Perez* for its dispositional order (see *Bryant,* at p. 1471), and contains the same frailties that undermine *Perez.* Second, *Bryant* seems to hold that a new trial motion based on juror misconduct must be supported by declarations that strictly comply with Code of Civil Procedure section 2015.5.[35] However, Evidence

---

[35] *Bryant's* discussion of this question, although contained under the heading "*Admissibility of Unsworn Statements of Jurors*" (*Bryant, supra,* 191 Cal.App.4th at p. 1467), cites numerous cases to support its statement that "California courts have consistently held that *properly executed juror affidavits are required* to establish jury misconduct of the type involved in this case." (*Id*. at p. 1468, italics added.) However, the cases cited by *Bryant* for this proposition do not so hold. For example, in *People v. Dykes* (2009) 46 Cal.4th 731, the new trial motion was supported solely by an unsworn report of an investigator's interview with the jury, and the prosecution objected to the evidence. (*Id*. at pp. 806-807.) *Dykes* concluded the showing was inadequate because it was based on unsworn testimony from an investigator and, moreover, was comprised of inadmissible hearsay from the jury. (*Id*. at pp. 810-811.) *Dykes* said nothing concerning declarations that were allegedly defective under Code of Civil Procedure section 2015.5. Similarly, in *People v. Hayes* (1999) 21 Cal.4th 1211, the court specifically noted the only evidence offered in support of the juror misconduct claim were the written statements from defense counsel and the defense investigator, neither of which was executed under penalty of perjury, regarding out-of-court statements by a juror; no statement (sworn or unsworn) of the juror herself was offered. (*Id*. at pp. 1255-1257.) *Hayes* said nothing concerning allegedly defective declarations under Code of Civil Procedure section 2015.5. All of the remaining cases cited by *Bryant* appear to be of a

46

Code section 1150, subdivision (a), provides only that: "Upon an inquiry as to the validity of a verdict, *any otherwise admissible evidence may be received* as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Italics added.) Contrary to *Bryant's* holding, nothing in that section (or in the cases cited by *Bryant*, see fn. 35, *ante*) limits "otherwise admissible evidence" to declarations strictly compliant with Code of Civil Procedure section 2015.5. Third, *Bryant* seems to suggest strict compliance with Code of Civil Procedure section 2015.5 is jurisdictional and cannot be waived, but nothing in Evidence Code section 1150 suggests a court may not admit technically deficient declarations when no objection raising such technical deficiencies is interposed below, and the vast weight of the law in analogous contexts is to the contrary. (See fn. 22, *ante*.)

Moreover, *Bryant's* decision to invoke *Perez* and remand for a new evidentiary hearing was decided in a factual context distinct from the facts here. In *Bryant*, the court concluded "it was error to reach the merits of the jury misconduct issue without the sworn affidavits required by law" (*Bryant, supra,* 191 Cal.App.4th at p. 1471), but *neither* side in *Bryant* had presented declarations signed under penalty of perjury. (*Id*. at p. 1466.)

similar ilk. While these cases support the proposition that unsworn statements (or sworn statements relating inadmissible hearsay statements of jurors) cannot be employed to attack a verdict, that case law has no relevance to *Bryant's* holding that declarations from jurors must precisely comply with Code of Civil Procedure section 2015.5 to provide the requisite evidence for a new trial motion.

*Bryant* observed "[t]he issues of misconduct asserted in this case are serious *and if proven by sworn evidence,* give rise to a presumption of prejudice" (*id.* at p. 1471, italics added), but decided that "[b]ecause the parties waived any objection to the unsworn statements at the suggestion of the trial court, the appropriate remedy is to return the matter to the trial court for a full and complete hearing with competent evidence." (*Id.* at p. 1471.) As in *Bryant,* the issues of misconduct asserted below were serious, but here (unlike *Bryant*) the misconduct *was* "proven by sworn evidence, giv[ing] rise to a presumption of prejudice." (*Ibid.*) Accordingly, it is unnecessary to invoke the remedy employed by *Bryant* because the defense in this case, having "proved *once* that [the] trial was unfair, [should nearly] three years later [not be] require[d] to prove it again." (*Von Villas, supra,* 11 Cal.App.4th at pp. 261-262 (dis. opn. of Woods, J.).)

The foregoing analysis convinces us that *Perez, Von Villas* and *Bryant* rest on dicta and questionable departures from stare decisis, and should not be followed. The foregoing analysis also convinces us that, even assuming those cases were correctly decided on their unique facts, the distinction between the decisive facts in those cases from those of the present case convinces us that *Perez, Von Villas* and *Bryant* would not control here. Accordingly, we adhere to our original decision, reverse the convictions and remand the cause for a new trial because the admissible evidence demonstrated that misconduct occurred and our independent review of the entire record convinces us the presumption of prejudice from the misconduct has not been rebutted.

B. The Sufficiency of the Evidence Claims

Defendants contend the evidence was insufficient to support any of the convictions and, alternatively the evidence was insufficient to support the torture convictions.

*Legal Standards*

When we review a challenge to the sufficiency of the evidence to support a verdict, we review all of the evidence most favorably to the verdict.  We draw all reasonable inferences in support of the verdict, but do not make credibility judgments or reweigh the evidence.  The question we must decide is whether there is sufficient, substantial evidence from which a reasonable jury could find the charge proved beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

" 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' "  (*People v. Bloyd* (1987) 43 Cal.3d 333, 347.)  " ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt" ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11), and we may neither reweigh the evidence nor reevaluate a witness's credibility.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129, disapproved on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  Where the circumstances reasonably justify the trier of fact's findings, the reviewing court's opinion that the

circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

*The Global Argument*

Defendants first argue that all of the convictions lack evidentiary support because the evidence was too speculative and rested on patently unbelievable testimony. Although there were numerous contradictions among the witnesses, a trier of fact could have found rational explanations for resolving the discrepancies, including the passage of time, the traumatic impact of the events, or the fact the witnesses' ability to perceive and recall had been hampered by their drug-induced fog. We cannot conclude the evidence was so inherently improbable that it could not support a conviction.

We are not persuaded the case was so speculative that there was insufficient evidence to support the convictions. Defendants argue, for example, that how and by whom Bowser was placed in the canal was necessarily speculative. However, if the trier of fact accepted that defendants (after threatening they would take Bowser and Martin out to the desert a "make [them] dig [their] own hole") in fact took Bowser with them around 6:00 a.m., and that her body was discovered around 3:00 a.m. the next morning, the trier of fact could infer that they followed through on their threat to kill Bowser, particularly if the jury further credited Vereen's testimony that Gaines told Vereen the next day that the "girl is in a canal with a bag over her head barely breathing." We cannot conclude as a matter of law that the evidence is insufficient to support the convictions.

50

*The Torture Argument*

Defendants alternatively argue that, even assuming the evidence supported the kidnapping and murder charges, there was no substantial evidence supporting the torture convictions because there was no evidence any of the victims suffered the requisite level of bodily injury required for a torture count under section 206.

"[T]orture has two elements: (1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223.) Defendants do not contest the sufficiency of the evidence on the intent element, but instead argue there was no evidence any of the victims suffered the requisite level of bodily injury. However, as this court reaffirmed in *People v. Pre* (2004) 117 Cal.App.4th 413, 420, "[s]ection 206 does not require permanent, disabling, or disfiguring injuries; '[s]ection 206 only requires "great bodily injury as defined in Section 12022.7" . . . . "Abrasions, lacerations and bruising can constitute great bodily injury." ' " As to Bowser, Dr. Garber observed her body had bruising present. As to Martin, she testified defendants burned her forehead with heated utensils. As to Hughes, he testified he was struck in the head with a gun butt with sufficient force that he still had a scar, that defendants also used a chisel and the flat end of nails pounded with a hammer to inflict such pain that he got dizzy and almost blacked out, and that he was "covered in blood" in the aftermath of their torture. We cannot conclude as a matter of law that a jury could not

have found the level of physical harm inflicted by defendants satisfied the requirements for conviction under section 206.

## DISPOSITION

The convictions are reversed and the matter is remanded for a new trial.


                                                                McDONALD, J.

I CONCUR:

AARON, J.

I CONCUR IN THE RESULT:

NARES, Acting P. J.